RAILROAD RETIREMENT BOARD ET AL. *v.* ALTON RAILROAD CO. ET AL.

No. 566.  Argued March 13, 14, 1935.—Decided May 6, 1935.

332

334

*Assistant Attorney General Stephens* and *Mr. Harry Shulman,* with whom *Solicitor General Biggs* and *Messrs. Carl McFarland, Hammond E. Chaffetz,* and *Max Turner* were on the brief, for petitioners.

336

338

340

*Messrs. Emmett E. McInnis* and *Jacob Aronson,* with whom *Messrs. Sydney R. Prince, Robert V. Fletcher, Edward S. Jouett, Dennis F. Lyons,* and *Sidney S. Alderman* were on the brief, for respondents.

342

344

MR. JUSTICE ROBERTS delivered the opinion of the Court.

The respondents, comprising 134 Class I railroads, two express companies, and the Pullman Company, brought this suit in the Supreme Court of the District of Columbia, asserting the unconstitutionality of the Railroad Retirement Act[1] and praying an injunction against its enforcement. From a decree granting the relief sought an appeal was perfected to the Court of Appeals. Before hearing in that tribunal the petitioners applied for a writ of certiorari, representing that no serious or difficult questions of fact were involved, and urging the importance of an early and final decision of the controversy. In the exercise of power conferred by statute[2] we issued the writ.[3]

The Act establishes a compulsory retirement and pension system for all carriers subject to the Interstate Commerce Act. There is provision for the creation of a fund to be deposited in the United States treasury (§§ 5, 8) and administered by a Board denominated an independent agency in the executive branch of the Government (§ 9). The retirement fund for payment of these pensions and for the expenses of administration of the system will arise from compulsory contributions from present and future employees and the carriers. The sums payable by the employees are to be percentages of their current compensation, and those by each carrier double the total payable by its employees. The Board is to determine from

[1] Act of June 27, 1934, c. 868, 48 Stat. 1283.
[2] U. S. C. Tit. 28, § 347 (a).
[3] 293 U. S. 552.

time to time what percentage is required to provide the necessary funds, but, until that body otherwise determines, the employee contribution is to be 2% of compensation (§ 5). Out of this fund annuities are to be paid to beneficiaries.

The classes of persons eligible for such annuities are (1) employees of any carrier on the date of passage of the Act; (2) those who subsequently become employees of any carrier; (3) those who within one year prior to the date of enactment were in the service of any carrier (§ 1b).

To every person in any of the three categories an annuity becomes payable: (a) when he reaches the age of 65 years, whether then in carrier service or not (§ 3); if still in such service he and his employer may agree that he shall remain for successive periods of one year until he attains 70, at which time he must retire (§ 4); (b) at the option of the employee, at any time between the ages of 51 and 65, if he has served a total of 30 years in the employ of one or more carriers, whether continuously or not (§§ 3; 1f). The compulsory retirement provision is not applicable to those in official positions until five years after the effective date of the Act (§ 4).

The annuity is payable monthly (§ 1d). The amount is ascertained by multiplying the number of years of service, not exceeding 30, before as well as subsequent to the date the Act was adopted, whether for a single carrier or a number of carriers, and whether continuous or not, by graduated percentages of the employee's average monthly compensation (excluding all over $300). If one who has completed 30 years of service elects to retire before attaining the age of 65 years, the annuity is reduced by one-fifteenth for each year he lacks of that age, unless the retirement is due to physical or mental disability (§ 3).

Upon the death of an employee, before or after retirement, his estate is to be repaid all that he has contributed

to the fund, with 3% interest compounded annually, less any annuity payments received by him (§ 3).

The Supreme Court of the District of Columbia declared the establishment of such a system within the competence of Congress; but thought several inseparable features of the Act transcended the legislative power to regulate interstate commerce, and required a holding that the law is unconstitutional in its entirety. Our duty, like that of the court below, is fairly to construe the powers of Congress, and to ascertain whether or not the enactment falls within them, uninfluenced by predilection for or against the policy disclosed in the legislation. The fact that the compulsory scheme is novel is, of course, no evidence of unconstitutionality. Even should we consider the Act unwise and prejudicial to both public and private interest, if it be fairly within delegated power our obligation is to sustain it. On the other hand, though we should think the measure embodies a valuable social plan and be in entire sympathy with its purpose and intended results, if the provisions go beyond the boundaries of constitutional power we must so declare.

The admitted fact that many railroads have voluntarily adopted pension plans does not aid materially in determining the authority of Congress to compel conformance to the one embodied in the Railroad Retirement Act; nor does the establishment of compulsory retirement plans in European countries, to which petitioners refer; for, in many of these, railroads are operated under government ownership, and none has a constitutional system comparable to ours.

The Federal Government is one of enumerated powers; those not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States or to the people. The Constitution is not a statute, but the supreme law of the land to which all

statutes must conform, and the powers conferred upon the Federal Government are to be reasonably and fairly construed, with a view to effectuating their purposes. But recognition of this principle can not justify attempted exercise of a power clearly beyond the true purpose of the grant. All agree that the pertinent provision of the Constitution is Article I, § 8, Clause 3, which confers power on the Congress " To regulate Commerce . . . among the several States . . ."; and that this power must be exercised in subjection to the guarantee of due process of law found in the Fifth Amendment.[4]

The petitioners assert that the questioned Act, fairly considered, is a proper and necessary regulation of interstate commerce; its various provisions have reasonable relation to the main and controlling purposes of the enactment, the promotion of efficiency, economy and safety; consequently it falls within the power conferred by the commerce clause and does not offend the principle of due process. The respondents insist that numerous features of the Act contravene the due process guaranty and further that the requirement of pensions for employees of railroads is not a regulation of interstate commerce within the meaning of the Constitution. These conflicting views open two fields of inquiry which to some extent overlap.[5] If we assume that under the power to

[4] See *Gibbons* v. *Ogden,* 9 Wheat. 1, 196–7; *Monongahela Navigation Co.* v. *United States,* 148 U. S. 312, 336; *Lottery Case,* 188 U. S. 321, 362–3; *United States* v. *Chicago, M., St. P. & P. R. Co.,* 282 U. S. 311, 327.

[5] When the question is whether the Congress has properly exercised a granted power the inquiry is whether the means adopted bear any reasonable relation to the ostensible exertion of the power. *Mugler* v. *Kansas,* 123 U. S. 623, 661; *Hammer* v. *Dagenhart,* 247 U. S. 251, 276; *Bailey* v. *Drexel Furniture Co.,* 259 U. S. 20, 37. When the question is whether legislative action transcends the limits of due process guaranteed by the Fifth Amendment, decision is guided by the

regulate commerce between the States Congress may require the carriers to make some provision for retiring and pensioning their employees, then the contention that various provisions of the Act are arbitrary and unreasonable and bear no proper relation to that end must be considered. If any are found which deprive the railroads of their property without due process, we must determine whether the remainder may nevertheless stand. Broadly, the record presents the question whether a statutory requirement that retired employees shall be paid pensions is regulation of commerce between the States within Article I, § 8.

1. We first consider the provisions affecting former employees. The Act makes eligible for pensions all who were in carrier service within one year prior to its passage, irrespective of any future reëmployment. About 146,000 persons fall within this class, which, as found below, includes those who have been discharged for cause, who have been retired, who have resigned to take other gainful employment, who have been discharged because their positions were abolished, who were temporarily employed, or who left the service for other reasons. These persons were not in carrier service at the date of the Act, and it is certain thousands of them never again will be. The petitioners say the provision was inserted to assure those on furlough, or temporarily relieved from duty subject to call, the benefit of past years of service, in the event of reëmployment, and to prevent the carriers from escaping their just obligations by omitting to recall these persons to service. And it is said that to attempt nicely to adjust the provisions of the Act to furloughed men

principle that the law shall not be unreasonable, arbitrary or capricious, and that the means selected shall have a real and substantial relation to the object sought to be attained. *Nebbia* v. *New York*, 291 U. S. 502, 525.

would involve difficulties of interpretation and inequalities of operation which the blanket provision avoids. We cannot accept this view. It is arbitrary in the last degree to place upon the carriers the burden of gratuities to thousands who have been unfaithful and for that cause have been separated from the service, or who have elected to pursue some other calling, or who have retired from the business, or have been for other reasons lawfully dismissed. And the claim that such largess will promote efficiency or safety in the future operation of the railroads is without support in reason or common sense.

In addition to the 146,000 who left the service during the year preceding the passage of the Act, over 1,000,000 persons have been but are not now in the employ of the carriers. The statute provides that if any of them is reemployed at any time, for any period, however brief, and in any capacity, his prior service with any carrier shall be reckoned in computing the annuity payable upon his attaining 65 years of age. Such a person may have been out of railroad work for years; his employment may have been terminated for cause; he may have elected to enter some other industry, and may have devoted the best years of his life to it; yet if, perchance, some carrier in a distant part of the country should accept him for work of any description, even temporarily, the Act throws the burden of his pension on all the railroads, including, it may be, the very one which for just cause dismissed him. Plainly this requirement alters contractual rights; plainly it imposes for the future a burden never contemplated by either party when the earlier relation existed or when it was terminated. The statute would take from the railroads' future earnings amounts to be paid for services fully compensated when rendered in accordance with contract, with no thought on the part of either employer or employee that further sums must be provided by the carrier. The

provision is not only retroactive in that it resurrects for new burdens transactions long since past and closed; but as to some of the railroad companies it constitutes a naked appropriation of private property upon the basis of transactions with which the owners of the property were never connected. Thus the Act denies due process of law by taking the property of one and bestowing it upon another. This onerous financial burden cannot be justified upon the plea that it is in the interest of economy, or will promote efficiency or safety. The petitioners say that one who is taken back into service will no doubt render more loyal service, since he will know he is to receive a bonus for earlier work. But he will not attribute this benefaction to his employer. The argument comes merely to the contentment and satisfaction theory discussed elsewhere. The petitioners also argue that if the provision in question threatens an unreasonable burden, the carriers have in their own control the means of avoidance, since no carrier need employ any person who has heretofore been in the railroad business. The position is untenable for several reasons. A carrier may wish to employ one having experience, who has been in another's service. Must it forego the opportunity because to choose the servant will impose a financial obligation arising out of an earlier employment with some other railroad? Would that promote efficiency and safety? The testimony shows that 22 per cent. of all railway employees have had prior service on some railroad. Must a carrier at its peril exercise, through dozens of employment agencies scattered over a vast territory, an unheard of degree of care to exclude all former railroad workers, at the risk of incurring the penalty of paying a pension for work long since performed for some other employer? So to hold would be highly unreasonable and arbitrary.

2. Several features of the Act, touching those now or hereafter in railroad employment, are especially challenged by the respondents.

No specified length of service is required for eligibility to pension, though the amount of the annuity is proportionately reduced if the total term of employment be less than 30 years. One may take a position with a carrier at twenty, remain until he is thirty, resign after gaining valuable skill and aptitude for his work, enter a more lucrative profession, and, though never thereafter in carrier employ, at 65 receive a pension calculated on his ten years of service. Or after ten years he may be discharged for peculation, and still be entitled to the gratuity. Or he may be relieved of duty for gross negligence, entailing loss of life or property, and yet collect his pension at 65. May these results be fairly denominated the indicia of reasonable regulation of commerce? May they be cited in favor of this pension system as an aid to economy, efficiency or safety? We cannot so hold. The petitioners' explanation of this feature of the Act is that no "real assurance" of "old-age security" is possible "when pension rights may be lost at any time by loss of employment"; that such a provision is reasonable "because it improves the morale of the employees while they are in the service." Assurance of security it truly gives, but, quite as truly, if "morale" is intended to connote efficiency, loyalty and continuity of service, the surest way to destroy it in any privately owned business is to substitute legislative largess for private bounty and thus transfer the drive for pensions to the halls of Congress and transmute loyalty to employer into gratitude to the legislature.

The Act assumes that, in fairness, both employer and employee should contribute in fixed proportions to a liberal pension. But we find that in contradiction of this recognized principle, thousands of those in the service at the date of the Act will at once become entitled to annuities, though they will have contributed nothing to the fund. The burden thus cast on the carriers is found to be for the first year of administration over $9,000,000,

and until the termination of payments to these annuitants not less than $78,000,000. All that has been said of the irrelevance of the requirement of payments based upon services heretofore terminated to any consideration of efficiency or safety applies here with equal force. The petitioners say that the retention of these men will be injurious and costly to the service. This view assumes they will be retained for years and are incompetent to do what they are now doing. Evidence is lacking to support either supposition. Next it is said "that they will receive from the fund more than they will have contributed is not significant for all retired employees receive more than they contribute." This attempted but futile justification is significant of the fault in the feature sought to be supported.

One who has served a total of 30 years is entitled to retire on pension at his election, at whatever his then attained age. Thus many who are experienced and reliable may at their own election deprive a carrier of their services, enter another gainful occupation, cease to contribute to the fund, and go upon the pension roll years before the fixed retirement age of 65. The finding is that there are not less than 100,000 in the service of the carriers between 51 and 65 years of age who have had 30 or more years of service. The option is not extended to them to retire on pension in order to improve transportation, for the choice is the employee's to be exercised solely on grounds personal to himself; and the provisions cannot promote economy, for the retiring worker's place will be filled by another who will receive the same wage. The court below properly found that "it is to the interest of the service of plaintiffs and is to the interest of the public that those of such employees who are competent and efficient be retained in carrier service for the benefit of their skill and experience." The petitioners say "clearly the provision in question is not arbitrary and unreason-

able so as to be unlawful"; but in support of this statement they adduce only the following considerations. As the pension is reduced 1/15th for each year the annuitant lacks of 65 at the date of retirement, his separation, it is said, will impose no greater burden on the fund than if he had waited until 65; the reduction in the amount payable will discourage early retirement, and so tend to counteract the loss of skilled workers; and, finally, "the justification for this provision is that employees who have completed thirty years of service may find it necessary, and it may be in the interest of the industry, for them to retire before age 65." We search in vain for any assertion that the feature under discussion will promote economy, efficiency or safety, and the absence of any such claim is not surprising. The best that can be said, it seems, is that the burden incident to the privilege of early retirement will not be as heavy as others imposed by the statute.

On June 27, 1934, when the Act was approved, there were 1,164,707 people in carrier employ. The Act, by conferring a statutory right to a pension, based in part on past service, gave the work theretofore performed by these persons a new quality. Although completed and compensated in full in conformity with the agreement of the parties, that work, done over a period of 30 years past, is to be the basis for further compulsory payment. While, as petitioners point out, the bounties are payable only in the future, any continuance of the relation, however brief, subsequent to the passage of the Act, matures a right which reaches back to the date of original employment. And to the amount payable in virtue of all these prior years' service, the employees contribute nothing. It is no answer to say that from the effective date of the law they will have to contribute from their wages half as much as do their employers. The future accrues its own annuities. The finding, accepted by the petitioners as veracious, is that the annuities payable for service performed prior to June

27, 1934, would in the year 1935 amount to $68,749,000 and would increase yearly until 1953, in which year the portion of the aggregate pension payments attributable to work antedating the passage of the Act would be $137,-435,000. These figures apply only to pensions to those now employed and exclude payments to those who left the service during the year prior to the adoption of the Act, and to those former employees who may hereafter be reëmployed.

This clearly arbitrary imposition of liability to pay again for services long since rendered and fully compensated is not permissible legislation. The court below held the provision deprived the railroads of their property without due process, and we agree with that conclusion. Here again the petitioners insist that the requirement is appropriate, because, they say, it does not demand additional pay for past services, but expenditure " for a present and future benefit through improvement of the personnel of the carriers." But the argument ends with mere statement. Moreover, if it were correct in its assumption, which we shall presently show it is not, nevertheless there can be no constitutional justification for arbitrarily imposing millions of dollars of additional liabilities upon the carriers in respect of transactions long closed on a basis of cost with reference to which their rates were made and their fiscal affairs adjusted.

The Act defines as an employee entitled to its benefits an official or representative of an employee organization who during or following employment by a carrier acts for such an organization in behalf of employees. Such an one may retire and receive a pension provided in future he pays an amount equal to the sum of the contributions of an employee and of an employer. The petitioners say the burden thus imposed is not great; but the provision exhibits the same arbitrary and unreasonable features

as those heretofore discussed, and seems irrelevant to any enhancement of safety or efficiency in transportation.

3. Certain general features of the system violate the Fifth Amendment. Under the statutory plan the draft upon the pension fund will be at a given rate, while the contributions of individual carriers to build up the fund will be at a disparate rate. This results from the underlying theory of the Act, which is that all the railroads shall be treated as a single employer. The report of the Senate subcommittee announced: [6]

"It is agreed that all railroads which have been subjected to the jurisdiction of Congress are to be treated together as one employer. All persons in the service of the railroads are to be regarded as employees of the one employer. . . . The old age pension or annuity is to be based upon the wages and the length of service upon all railroads, with specified maximum limits."

The petitioners themselves showed at the trial that the probable age of entry into service of typical carriers differs materially; for one it is 28.4, for another 32.4, for a third 29.3, and for a fourth 34.2. Naturally the age of a pensioner at date of employment will affect the resultant burden upon the contributors to the fund. The statute requires that all employees of age 70 must retire immediately. It is found that 56 of the respondents have no employees in that class. Nevertheless they must contribute toward the pensions of such employees of other respondents nearly $4,000,000 the first year and nearly $33,000,000 in the total. The petitioners admit that these are the facts, but attempt to avoid their force by the assertion that "the cost differentials which are involved are negligible as compared with the total cost." This can only mean that in view of the enormous total cost to all

---

[6] Cong. Rec., Vol. 78, p. 5699.

the railroads, the group thus discriminated against should not complain of the disregard of their ownership of their own assets, because in comparison with gross cost the additional payments due to the inequality mentioned are small.

The evidence shows that some respondents are solvent and others not, a situation which often may recur. The petitioners concede that the plan is intended to furnish assurance of payment of pensions to employees of all the carriers, with the result that solvent railroads must furnish the money necessary to meet the demands of the system upon insolvent carriers, since the very purpose of the Act is that the pension fund itself shall be kept solvent and able to answer all the obligations placed upon it.

In recent years many carriers subject to the Interstate Commerce Act have gone out of existence. The petitioners admit that the employees of these defunct carriers are treated upon exactly the same basis as the servants of existing carriers. In other words, past service for a carrier no longer existing is to be added to any service hereafter rendered to an operating carrier, in computing a pension the whole burden of payment of which falls on those carriers still functioning. And all the future employees of any railroad which discontinues operation must be paid their pensions by the surviving roads. Again the answer of the petitioners is that the amount will be negligible. The fact that millions of dollars are involved in other features of the Act will not serve to obscure this violation of due process.

All the carriers must make good the contributions of all employees, for § 3 directs that upon the death of an employee the Board shall pay to his estate from the fund what he has contributed to it with 3 per cent. interest compounded annually, less any payments he has received. The railroads are not only liable for their own contributions, but are, in a measure, made insurers of those of

the employees. This appears to be an unnecessarily harsh and arbitrary imposition, if the plan is to be what on its face it imports, a joint adventure with mutuality of obligation and benefit.

This court has repeatedly had occasion to say that the railroads, though their property be dedicated to the public use, remain the private property of their owners, and that their assets may not be taken without just compensation.[7] The carriers have not ceased to be privately operated and privately owned, however much subject to regulation in the interest of interstate commerce. There is no warrant for taking the property or money of one and transferring it to another without compensation, whether the object of the transfer be to build up the equipment of the transferee or to pension its employees.

The petitioners insist that since the adoption of the Transportation Act, 1920, and as the logical consequence of decisions of this court, we must recognize that Congress may deal with railroad transportation as a whole and regulate the carriers generally and in classes, with an eye to improvement and development of railway service as a whole; that the interstate carriers use common facilities, make through rates, and interact amongst themselves in various ways, with the result that where any link in the chain lacks efficiency the system as a whole is affected. The argument is that since the railroads and the public have a common interest in the efficient performance of the whole transportation chain, it is proper and necessary to require all carriers to contribute to the cost of a plan designed to serve this end. It is said that the pooling principle is desirable because there are many small carriers whose employees are too few to justify maintenance of a separate retirement plan for each. And finally, the

---

[7] *Interstate Commerce Commission* v. *Oregon-Washington R. Co.*, 288 U. S. 14, 40, and cases cited.

claim is that in fixing carrier contributions, any attempt to give consideration to difference in age, classification, and service periods of employees, would involve grave administrative difficulties and unduly increase the cost of administration. With these considerations in view the petitioners urge that our decisions sanction the exercise of the power involved in the pooling feature of the statute. They rely upon the *New England Divisions Case,* 261 U. S. 184. That case, however, dealt purely with rates; and while the policy of awarding a larger share of the division of a joint rate to the weaker carrier, in consideration of its need for revenue, was approved, the approval was definitely conditioned upon the circumstance that the share or division of the joint rate awarded to the stronger carrier was not so low as to require it to serve for an unreasonable rate. Thus the principle that Congress has no power to confiscate the property of one carrier for the benefit of another was fully recognized.

*Dayton-Goose Creek Ry. Co.* v. *United States,* 263 U. S. 456, approved the provision of the Transportation Act, 1920, which required the carriers to contribute " one-half of their excess earnings " to a revolving fund to be used by the Interstate Commerce Commission for making loans to carriers to meet capital expenditures and to refund maturing obligations, or to purchase equipment and facilities which might be leased to carriers. This case is relied upon as sustaining the principle underlying the pension act, but we think improperly. The provision was sustained upon the ground that it must be so administered as to leave to each carrier a reasonable return upon its property devoted to transportation, and the holding is clear that if this principle were not observed in administration, the Act would invade constitutional rights.

*Atlantic Coast Line R. Co.* v. *Riverside Mills,* 219 U. S. 186, which the petitioners cite, is even wider of the mark. There this court upheld the Carmack Amendment,

which made the initial carrier liable to the consignor for loss of goods contracted to be delivered over connecting lines. The legislation merely attached certain consequences to a given form of contract. It was recognized that initial carriers in fact enter into contracts for delivery of goods beyond their own lines and make through or joint rates over independent lines. This being so, it was held a proper exercise of the power of regulation to require one so contracting to be liable in the first instance to the shipper. So to regulate a recognized form of contract is not offensive to the Fifth Amendment.

It is claimed that several other decisions confirm the legality of the pooling principle, when reasonably applied. For this position petitioners cite *Mountain Timber Co.* v. *Washington,* 243 U. S. 219; *Noble State Bank* v. *Haskell,* 219 U. S. 104, and *Thornton* v. *Duffy,* 254 U. S. 361. In the first of these the Washington workmen's compensation Act, which required employers in extra-hazardous employment to pay into a state fund certain premiums based upon the percentage of estimated pay roll of the workmen employed, was under attack. For the purpose of payments into the fund, accounts were to be kept with each industry in accordance with a statutory classification, and it was definitely provided that no class should be liable for the depletion of the accident fund by reason of accidents happening in any other class. The Act therefore clearly recognized the difference in drain or burden on the fund arising from different industries, and sought to equate the burden in accordance with the risk. The challenge of the employers was that the statute failed of equitable apportionment as between the constituted classes. But no proof was furnished to that effect, and this court assumed that the classification was made in an effort at fairness and equity as between classes. The Railroad Retirement Act, on the contrary, makes no classification, but, as above said,

treats all the carriers as a single employer, irrespective of their several conditions.

In the second case this court upheld a statute which required state banks to contribute a uniform percentage of their deposits to a state guaranty fund established for the purpose of making good losses to the depositors of banks which might become insolvent. The Act was sustained upon the principle that an ulterior public advantage may justify the taking of a comparatively insignificant amount of private property for what in its immediate purpose is a private use. It was further said that there may be cases other than those of taxation in which the share of each party in the benefit of a scheme of mutual protection is sufficient compensation for the correlative burden which it is compelled to assume. These considerations clearly distinguish that case from the one now under discussion.

In the case last cited it was asserted that the workmen's compensation Act of Ohio unfairly discriminated because it allowed employers in certain cases to pay directly to workmen or their dependents the compensation provided by law, in lieu of contributing to the state fund established to secure such payments. This court held that the classification did not amount to a denial of due process.

We conclude that the provisions of the Act which disregard the private and separate ownership of the several respondents, treat them all as a single employer, and pool all their assets regardless of their individual obligations and the varying conditions found in their respective enterprises, cannot be justified as consistent with due process.

The Act is said to be unconstitutional because unreasonably and unconscionably burdensome and oppressive upon the respondents, and we are referred to a finding of the court below to which petitioners do not assign error.

The facts as found are: based upon present payrolls, the carriers' contributions for the first year will aggregate not less than $60,000,000; at the rates fixed in the Act, total employee and carrier contributions will, on the basis of present payrolls, be approximately $90,000,000 per year; unless the amount of the contributions is increased by the Board, the drain on the fund for payment of pensions will result in a deficit of over $11,000,000 by the year 1942. To keep the fund in operation it will be necessary for the Board to increase the percentages of contributions named in the Act. The petitioners' actuary testified that in the tenth year of operation the payments from the fund will be upwards of $137,000,000. The railroads' total contribution to pensions on account of prior service of employees in service at the date of the Act may amount to $2,943,966,000. We are not prepared to hold that if the law were in other respects within the legislative competence, the enormous cost involved in its administration would invalidate it; but the recited facts at least emphasize the burdensome and perhaps destructive effect of the contraventions of the due process of law clause which we find exist. Moreover they exhibit the inconsistency of the petitioners' position that the law is necessary because in times of depression the voluntary systems of the carriers are threatened by loss of revenue. It is difficult to perceive how the vast increase in pension expense entailed by the statute will, without provision of additional revenue, relieve the difficulty experienced by some railroads in meeting the demands of the plans now in force.

4. What has been said sufficiently indicates our agreement with the holding of the trial court respecting the disregard of due process exhibited by a number of the provisions of the Act. We also concur in that court's views concerning the inseverability of certain of them. The statute contains a section broadly declaring the intent that invalid provisions shall not operate to destroy

the law as a whole.[8]  Such a declaration provides a rule which may aid in determining the legislative intent, but is not an inexorable command.  *Dorchy* v. *Kansas*, 264 U. S. 286.  It has the effect of reversing the presumption which would otherwise be indulged, of an intent that unless the act operates as an entirety it shall be wholly ineffective.  *Williams* v. *Standard Oil Co.*, 278 U. S. 235, 242; *Utah Power & Light Co.* v. *Pfost*, 286 U. S. 165, 184. But notwithstanding the presumption in favor of divisibility which arises from the legislative declaration, we cannot rewrite a statute and give it an effect altogether different from that sought by the measure viewed as a whole.  Compare *Hill* v. *Wallace*, 259 U. S. 44, 70.  In this view we are confirmed by the petitioners' argument that as to some of the features we hold unenforcible, it is " unthinkable " and " impossible " that the Congress would have created the compulsory pension system without them.  They so affect the dominant aim of the whole statute as to carry it down with them.

5. It results from what has now been said that the Act is invalid because several of its inseparable provisions contravene the due process of law clause of the Fifth Amendment.  We are of opinion that it is also bad for another reason which goes to the heart of the law, even if it could survive the loss of the unconstitutional features which we have discussed.  The Act is not in purpose or effect a regulation of interstate commerce within the meaning of the Constitution.

Several purposes are expressed in § 2 (a), amongst them: to provide " adequately for the satisfactory retirement of aged employees "; " to make possible greater

---

[8] Sec. 14. If any provision of this Act, or the application thereof to any person or circumstances, is held invalid, the remainder of the Act or application of such provision to other persons or circumstances shall not be affected thereby.

employment opportunity and more rapid advancement;" to provide by the administration and construction of the Act " the greatest practicable amount of relief from unemployment and the greatest possible use of resources available for said purpose and for the payment of annuities for the relief of superannuated employees." The respondents assert and the petitioners admit that though these may in and of themselves be laudable objects, they have no reasonable relation to the business of interstate transportation. The clause, however, states a further purpose, the promotion of " efficiency and safety in interstate transportation," and the respondents concede that an Act, the provisions of which show that it actually is directed to the attainment of such a purpose, falls within the regulatory power conferred upon the Congress; but they contend that here the provisions of the statute emphasize the necessary conclusion that the plan is conceived solely for the promotion of the stated purposes other than efficient and safe operation of the railroads. The petitioners' view is that this is the true and only purpose of the enactment, and the other objects stated are collateral to it and may be disregarded if the law is found apt for the promotion of this legitimate purpose.

From what has already been said with respect to sundry features of the statutory scheme, it must be evident that petitioners' view is that safety and efficiency are promoted by two claimed results of the plan: the abolition of excessive superannuation, and the improvement of morale.

The parties are at odds respecting the existing superannuation of railway employees. Petitioners say it is much greater than that found in the heavy industries. Respondents assert it is less, and the court below so found. The finding is challenged as being contrary to the evidence. We may, for present purposes, assume that " superannuation " as petitioners use the term, i. e., the

attainment of 65 years, is as great or greater in the railroad industry than in comparable employments. It does not follow, as contended, that the man of that age is inefficient or incompetent. The facts indicate a contrary conclusion. Petitioners say the seniority rules and the laying off of younger men first in reducing forces, necessarily tend to keep an undue proportion of older men in the service. They say this tendency has long been marked in the railroad industry and has been most noticeable in recent years of depression when forces have been greatly reduced. But what are the uncontradicted facts as to efficiency and safety of operation? Incontrovertible statistics obtained from the records of the Interstate Commerce Commission show a steady increase in safety of operation, during this period of alleged increasing superannuation.[9]

---

[9] Tables included in the record are as follows:

Year:

| 1905, 1 passenger killed for each | 1,376,000 carried. |
|---|---|
| 1910, 1 " " " " | 3,000,000 " |
| 1915, 1 " " " " | 4,954,000 " |
| 1920, 1 " " " " | 5,673,000 " |
| 1925, 1 " " " " | 5,237,000 " |
| 1930, 1 " " " " | 11,658,000 " |
| 1932, 1 " " " " | 17,921,000 " |

Decrease in frequency, 77%.

| Year | Total Frt. Psgr. and Motor Train Miles (Thousands) | Total Train Accidents | Frequency Per Million Train Miles |
|---|---|---|---|
| 1923 | 1,207,714 | 27,497 | 22.77 |
| 1924 | 1,171,812 | 22,368 | 19.09 |
| 1925 | 1,187,731 | 20,785 | 17.50 |
| 1926 | 1,211,617 | 21,077 | 17.39 |
| 1927 | 1,184,455 | 18,976 | 16.02 |
| 1928 | 1,169,442 | 16,949 | 14.49 |
| 1929 | 1,178,585 | 17,185 | 14.58 |
| 1930 | 1,082,306 | 12,313 | 11.38 |
| 1931 | 951,220 | 8,052 | 8.46 |
| 1932 | 813,091 | 5,770 | 7.09 |

Decrease in frequency, 69%.

Indeed, one of the petitioners, and one of their most important witnesses, has written, referring to railroads:

"Experience seems to have proved, moreover, that older workers cause fewer accidents than do younger; hence there is little necessity for removing them on that ground." [10]

There is overwhelming evidence in the record to the same effect. All that petitioners offer on the subject in their brief is: " in an industry having as many hazardous

| Year | Total man-hours worked by all employees (thousands) | Total employees killed and injured | | | Total casualty rate all employees per million man-hours |
| --- | --- | --- | --- | --- | --- |
| | | Killed | Injured | Total | |
| 1923 | 4, 856, 964 | 1, 866 | 148, 146 | 150, 012 | 30. 89 |
| 1924 | 4, 473, 186 | 1, 403 | 120, 912 | 122, 315 | 27. 34 |
| 1925 | 4, 448, 377 | 1, 460 | 114, 639 | 116, 099 | 26. 10 |
| 1926 | 4, 557, 537 | 1, 528 | 107, 218 | 108, 746 | 23. 86 |
| 1927 | 4, 406, 627 | 1, 427 | 83, 883 | 85, 310 | 19. 36 |
| 1928 | 4, 191, 065 | 1, 187 | 66, 744 | 67, 931 | 16. 21 |
| 1929 | 4, 225, 292 | 1, 302 | 57, 164 | 58, 466 | 13. 84 |
| 1930 | 3, 641, 412 | 898 | 33, 184 | 34, 082 | 9. 36 |
| 1931 | 2, 930, 657 | 621 | 21, 417 | 22, 038 | 7. 52 |
| 1932 | 2, 286, 561 | 532 | 16, 359 | 16, 891 | 7. 39 |

Decrease in frequency, 76%.

| Year | Man-hours worked by Trainmen (Thousands) | Number Trainmen Killed | Number Trainmen Injured | Total Trainmen's Casualties | Total Casualty Rate Per Million Man-hours |
| --- | --- | --- | --- | --- | --- |
| 1923 | 915, 084 | 896 | 35, 342 | 36, 238 | 39. 60 |
| 1924 | 829, 533 | 628 | 28, 438 | 29, 066 | 35. 04 |
| 1925 | 831, 682 | 691 | 28, 297 | 28, 989 | 34. 86 |
| 1926 | 858, 598 | 691 | 29, 864 | 30, 555 | 35. 59 |
| 1927 | 812, 853 | 639 | 24, 462 | 25, 101 | 30. 88 |
| 1928 | 776, 184 | 501 | 20, 943 | 21, 444 | 27. 63 |
| 1929 | 785, 504 | 587 | 19, 116 | 19, 703 | 24. 96 |
| 1930 | 673, 208 | 423 | 11, 771 | 12, 194 | 18. 11 |
| 1931 | 546, 277 | 292 | 8, 259 | 8, 551 | 15. 65 |
| 1932 | 431, 083 | 265 | 6, 318 | 6, 583 | 15. 27 |

Decrease in frequency, 61%.

[10] Latimer, Industrial Pension Systems, Vol. II, 724.

occupations as the railway industry, improvement in personnel conditions is likely to mean increased safety." We think it not unfair to say that the claim for promotion of safety is virtually abandoned.

How stands the case for efficiency? Here again the record without contradiction demonstrates that in step with the alleged progressive superannuation on the railroads their operations have increased in efficiency.[11] The trial court found, and its finding is not assigned as error: " Railroads were, when the Act was enacted, and are now, operated efficiently and safely and more efficiently and much more safely than at any time in history."

Lastly the petitioners suggest that diminution of superannuation promotes economy, because younger and lower paid men will replace the retired older men. But the argument is based upon inadvertent disregard of the wage structure of the carriers, especially in the train and engine service, whereby contract compensation is based not on age but upon the nature of the duties performed. The replacement of one by another who is to do the same work will therefore beget no saving in wages.

When to these considerations is added that, as heretofore said, the Act disregards fitness to work, pensions the worker who retires at his option before any suggested superannuation, irrespective of skill or ability, pensions those who are presently compelled by the law to retire, irrespective of their fitness to labor, and grants annuities to those who are discharged for dishonesty or gross care-

---

[11] Thus it appears that the average speed of freight trains between terminals in 1928 was 10.9 miles per hour, in 1929 was 13.2 miles per hour, and in 1933 was 15.7 miles per hour. Excluding weight of locomotive and tender each freight train hour in 1923 produced 16,764 gross ton-miles; in 1929 produced 24,539 gross ton-miles; and in 1933 produced 27,343 gross ton-miles; and net ton-miles per freight train hour increased 41.2 per cent. from 1923 to 1933, and 3.7 per cent. from 1929 to 1933. Cost of transportation is also shown to have decreased in the same periods.

lessness, it becomes perfectly clear that, though the plan may bring about the social benefits mentioned in § 2a, it has and can have no relation to the promotion of efficiency, economy or safety by separating the unfit from the industry. If these ends demand the elimination of aged employees, their retirement from the service would suffice to accomplish the object. For these purposes the prescription of a pension for those dropped from service is wholly irrelevant. The petitioners, conscious of the truth of this statement, endeavor to avoid its force by the argument that social and humanitarian considerations demand the support of the retired employee. They assert that it would be unthinkable to retire a man without pension and add that attempted separation of retirement and pensions is unreal in any practical sense, since it would be impossible to require carriers to cast old workers aside without means of support. The supposed impossibility arises from a failure to distinguish constitutional power from social desirability. The relation of retirement to safety and efficiency is distinct from the relation of a pension to the same ends, and the two relationships are not to be confused.

In final analysis, the petitioners' sole reliance is the thesis that efficiency depends upon morale, and morale in turn upon assurance of security for the worker's old age. Thus pensions are sought to be related to efficiency of transportation, and brought within the commerce power. In supporting the Act the petitioners constantly recur to such phrases as "old age security," "assurance of old age security," "improvement of employee morale and efficiency through providing definite assurance of old age security," "assurance of old age support," "mind at ease," and "fear of old age dependency." These expressions are frequently connected with assertions that the removal of the fear of old age dependency will tend to create a better morale throughout the ranks of employees.

The theory is that one who has an assurance against future dependency will do his work more cheerfully, and therefore more efficiently. The question at once presents itself whether the fostering of a contented mind on the part of an employee by legislation of this type, is in any just sense a regulation of interstate transportation. If that question be answered in the affirmative, obviously there is no limit to the field of so-called regulation. The catalogue of means and actions which might be imposed upon an employer in any business, tending to the satisfaction and comfort of his employees, seems endless. Provision for free medical attendance and nursing, for clothing, for food, for housing, for the education of children, and a hundred other matters, might with equal propriety be proposed as tending to relieve the employee of mental strain and worry. Can it fairly be said that the power of Congress to regulate interstate commerce extends to the prescription of any or all of these things? Is it not apparent that they are really and essentially related solely to the social welfare of the worker, and therefore remote from any regulation of commerce as such? We think the answer is plain. These matters obviously lie outside the orbit of Congressional power. The answer of the petitioners is that not all such means of promoting contentment have such a close relation to interstate commerce as pensions. This is in truth no answer, for we must deal with the principle involved and not the means adopted. If contentment of the employee were an object for the attainment of which the regulatory power could be exerted, the courts could not question the wisdom of methods adopted for its advancement.

No support for a plan which pensions those who have retired from the service of the railroads can be drawn from the decisions of this court sustaining measures touching the relations of employer and employee in the carrier field in the interest of a more efficient system of transpor-

tation. The Safety Appliance Acts, the Employers' Liability Acts, hours-of-service laws, and others of analogous character, cited in support of this Act, have a direct and intimate connection with the actual operation of the railroads. No less inapposite are the statutes which deal with exchange of facilities, joint facilities, joint rates, etc. For these have an obvious and direct bearing on the obligations of public service incident to the calling of the railroads. The railway labor act was upheld by this court upon the express ground that to facilitate the amicable settlement of disputes which threatened the service of the necessary agencies of interstate transportation tended to prevent interruptions of service and was therefore within the delegated power of regulation. It was pointed out that the act did not interfere with the normal right of the carrier to select its employees or discharge them. *Texas & New Orleans R. Co.* v. *Railway Clerks*, 281 U. S. 548, 570–1. The legislation considered in *Wilson* v. *New*, 243 U. S. 332, was drafted to meet a particular exigency and its validity depended upon circumstances so unusual that this court's decision respecting it cannot be considered a precedent here.

Stress is laid upon the supposed analogy between workmen's compensation laws and the challenged statute. It is said that while Congress has not adopted a compulsory and exclusive system of workmen's compensation applicable to interstate carriers, no one doubts the power so to do; and the Retirement Act cannot in principle be distinguished. The contention overlooks fundamental differences. Every carrier owes to its employees certain duties the disregard of which render it liable at common law in an action sounding in tort. Each state has developed or adopted, as part of its jurisprudence, rules as to the employer's liability in particular circumstances. These are not the same in all the states. In the absence of a rule applicable to all engaged in interstate transpor-

370

tation the right of recovery for injury or death of an employee may vary depending upon the applicable state law.  That Congress may, under the commerce power, prescribe an uniform rule of liability and a remedy uniformly available to all those so engaged, is not open to doubt.  The considerations upon which we have sustained compulsory workmen's compensation laws passed by the states in the sphere where their jurisdiction is exclusive apply with equal force in any sphere wherein Congress has been granted paramount authority.  Such authority it may assert whenever its exercise is appropriate to the purpose of the grant.  A case in point is the Longshoremen's and Harbor Workers' Compensation Act, passed pursuant to the delegation of admiralty jurisdiction to the United States.  Modern industry, and this is particularly true of railroads, involves instrumentalities, tasks and dangers unknown when the doctrines of the common law as to negligence were developing.  The resultant injuries to employees, impossible of prevention by the utmost care, may well demand new and different redress from that afforded in the past.  In dealing with the situation it is permissible to substitute a new remedy for the common-law right of action; to deprive the employer of common-law defenses and substitute a fixed and reasonable compensation commuted to the degree of injury; to replace uncertainty and protracted litigation with certainty and celerity of payment; to eliminate waste; and to make the rule of compensation uniform throughout the field of interstate transportation, in contrast with inconsistent local systems.  By the very certainty that compensation must be paid for every injury such legislation promotes and encourages precaution on the part of the employer against accident and tends to make transportation safer and more efficient.  The power to prescribe an uniform rule for the transportation industry through-

out the country justifies the modification of common law rules by the Safety Appliance Acts and the Employers' Liability Acts applicable to interstate carriers, and would serve to sustain compensation acts of a broader scope, like those in force in many states. The collateral fact that such a law may produce contentment among employees,—an object which as a separate and independent matter is wholly beyond the power of Congress,—would not, of course, render the legislation unconstitutional. It is beside the point that compensation would have to be paid despite the fact that the carrier has performed its contract with its employee and has paid the agreed wages. Liability in tort is imposed without regard to such considerations; and in view of the risks of modern industry the substituted liability for compensation likewise disregards them. Workmen's compensation laws deal with existing rights and liabilities by readjusting old benefits and burdens incident to the relation of employer and employee. Before their adoption the employer was bound to provide a fund to answer the lawful claims of his employees; the change is merely in the required disbursement of that fund in consequence of the recognition that the industry should compensate for injuries occurring with or without fault. The Act with which we are concerned seeks to attach to the relation of employer and employee a new incident, without reference to any existing obligation or legal liability, solely in the interest of the employee, with no regard to the conduct of the business, or its safety or efficiency, but purely for social ends.

The petitioners, in support of their argument as to morale, rely upon the voluntary systems adopted in past years by almost all the carriers, and now in operation. The argument runs that these voluntary plans were adopted in the industry for two principal reasons—the creation of loyalty and the encouragement of continuity

in service. The petitioners quote from a statement by the National Industrial Conference Board the following:

" More specifically, the efficiency of the individual workers is stimulated by the feeling of security and hopefulness that results when the individual is relieved of the fear of destitution and dependency in old age and by the sentiment of loyalty and good will fostered by the pension plan, which thus operates as a spur to the ambition of the worker and incites him to more intensive and sustained effort. Similarly the efficiency of the organization as a whole is increased by the improvement of industrial relations, the development of a coöperative spirit, and the promotion of constancy and continuity of employment."

They assert that the Railroad Retirement Act, " although it embodies the first compulsory retirement and pension plan enacted in this country, is but the development of voluntary plans which have been in use in this country, particularly among the railroads, for more than a third of a century." The argument is self-contradictory. If, as is conceded, the purpose of the voluntary establishment of pensions is to create loyalty to the employer who establishes them, and continuity in his service, it seems axiomatic that the removal of the voluntary character of the pension and the imposition of it in such form as Congress may determine, upon all employers, and irrespective of length of service, or of service for the same employer, will eliminate all sense of loyalty or gratitude to the employer, and remove every incentive to continuance in the service of a single carrier. In fact the petitioners so admit, for they say in their brief:

" That the benefits which respondents expected to derive from their voluntary pension plans (said to be (1) greater continuity of service and (2) improved employee loyalty) differ from those emphasized in the Retirement Act does not affect the Act's validity, so long as it is calculated in other ways to promote efficiency and safety."

We are left to surmise what these " other ways " may be unless they are the contentment and assurance of security so much stressed in the argument. The petitioners, in effect, say: the carriers with certain objects and purposes have adopted voluntary systems; this proves that pensions are germane to the railroad business; Congress may legislate on any subject germane to interstate transportation; therefore Congress may for any reason or with any motive impose any type of pension plan. The contention comes very near to this,—that whatever some carriers choose to do voluntarily in the management of their business, at once invests Congress with the power to compel all carriers to do. The fallacy is obvious. The meaning of the commerce and due process clauses of the Constitution is not so easily enlarged by the voluntary acts of individuals or corporations.

Counsel for the petitioners admit that " it may well be " voluntary plans are intended to promote efficiency and safety by " inducing loyalty and continuity," and " it could also be true that these means were ignored in the Retirement Act." They add:

" Congress has deliberately chosen the means of providing old age security for all railroad employees, measured by years of service, but not dependent upon continuity of service with any particular carrier, as is required under the existing railway pension systems. If it were true, as claimed, that the Act will not encourage continuity of service and will remove the incentives for employee loyalty to employer, it has other virtues, as has been indicated; for example, it provides greater assurance to employees of old age security than has been the case under the carriers' pension plans, and is likely to be productive of efficiency through improvement of employee morale."

Certainly the argument is inconsistent with any thought that a plan imposed by statute, requiring the

payment of a pension, will promote the same loyalty and continuity of service which were the ends and objects of the voluntary plans. It is going far to say, as petitioners do, that Congress chose the more progressive method " already tried in the laboratory of industrial experience," which they claim has been approved and recommended by those qualified to speak. In support of the assertion, however, they cite general works dealing with voluntary pension plans, and not with any such compulsory system as that with which we are concerned. We think it cannot be denied, and, indeed, is in effect admitted, that the sole reliance of the petitioners is upon the theory that contentment and assurance of security are the major purposes of the Act. We cannot agree that these ends if dictated by statute, and not voluntarily extended by the employer, encourage loyalty and continuity of service. We feel bound to hold that a pension plan thus imposed is in no proper sense a regulation of the activity of interstate transportation. It is an attempt for social ends to impose by sheer fiat non-contractual incidents upon the relation of employer and employee, not as a rule or regulation of commerce and transportation between the States, but as a means of assuring a particular class of employees against old age dependency. This is neither a necessary nor an appropriate rule or regulation affecting the due fulfilment of the railroads' duty to serve the public in interstate transportation.

The judgment of the Supreme Court of the District of Columbia is

*Affirmed.*

The CHIEF JUSTICE, dissenting.

I am unable to concur in the decision of this case. The gravest aspect of the decision is that it does not rest simply upon a condemnation of particular features of the Railroad Retirement Act, but denies to Congress the power to pass any compulsory pension act for railroad

employees. If the opinion were limited to the particular provisions of the Act, which the majority find to be objectionable and not severable, the Congress would be free to overcome the objections by a new statute. Classes of persons held to be improperly brought within the range of the Act could be eliminated. Criticisms of the basis of payments, of the conditions prescribed for the receipt of benefits, and of the requirements of contributions, could be met. Even in place of a unitary retirement system another sort of plan could be worked out. What was thus found to be inconsistent with the requirements of due process could be excised and other provisions substituted. But after discussing these matters, the majority finally raise a barrier against all legislative action of this nature by declaring that the subject matter itself lies beyond the reach of the congressional authority to regulate interstate commerce. In that view, no matter how suitably limited a pension act for railroad employees might be with respect to the persons to be benefited, or how appropriate the measure of retirement allowances, or how sound actuarially the plan, or how well adjusted the burden, still under this decision Congress would not be at liberty to enact such a measure. That is a conclusion of such serious and far-reaching importance that it overshadows all other questions raised by the Act. Indeed, it makes their discussion superfluous. The final objection goes, as the opinion states, " to the heart of the law, even if it could survive the loss of the unconstitutional features " which the opinion perceives. I think that the conclusion thus reached is a departure from sound principles and places an unwarranted limitation upon the commerce clause of the Constitution.

*First.* In defining the power vested in Congress to regulate interstate commerce, we invariably refer to the classic statement of Chief Justice Marshall. It is the power " to prescribe the rule by which commerce is to be governed."

The power " is complete in itself, may be exercised to its utmost extent, and acknowledges no limitations, other than are prescribed in the constitution." *Gibbons* v. *Ogden,* 9 Wheat. 1, 196. It is a power to enact " all appropriate legislation for the protection and advancement " of interstate commerce. *The Daniel Ball,* 10 Wall. 557, 564. " To regulate," we said in the *Second Employers Liability Cases,* 223 U. S. 1, 47, " in the sense intended, is to foster, protect, control and restrain, with appropriate regard for the welfare of those who are immediately concerned and of the public at large." And the exercise of the power, thus broadly defined, has had the widest range in dealing with railroads, which are engaged as common carriers in interstate transportation. As their service is vital to the nation, nothing which has a real or substantial relation to the suitable maintenance of that service, or to the discharge of the responsibilities which inhere in it, can be regarded as beyond the power of regulation. *The Shreveport Case,* 234 U. S. 342, 351; *Dayton-Goose Creek Ry. Co.* v. *United States,* 263 U. S. 456, 478; *Colorado* v. *United States,* 271 U. S. 153, 163, 164; *N. Y. Central Securities Corp.* v. *United States,* 287 U. S. 12, 24, 25.

It was inevitable that, with the development of the transportation system of the country, requiring a vast number of employees, there should have been a growing appreciation of the importance of conditions of employment. It could not be denied that the sovereign power to govern interstate carriers extends to the regulation of their relations with their employees who likewise are engaged in interstate commerce. The scope of this sort of regulation has been extensive. There has been not only the paramount consideration of safety, but also the recognition of the fact that fair treatment in other respects aids in conserving the peace and good order which are essential to the maintenance of the service without disastrous interruptions, and in promoting the efficiency which inevi-

tably suffers from a failure to meet the reasonable demands of justice. An absolute duty to furnish safety appliances has been imposed, restrictions of hours of continuous service have been prescribed, standards of a day's work have been established for work and wages, the liability of carriers for injuries to employees has been regulated by the abrogation of the fellow servant rule and the limitation of defenses as to contributory negligence and assumption of risk, and provisions have been enacted to facilitate the amicable settlement of disputes and to protect employees in their freedom to organize for the purpose of safeguarding their interests. *St. Louis I. M. & S. Ry. Co.* v. *Taylor,* 210 U. S. 281; *Baltimore & Ohio R. Co.* v. *Interstate Commerce Comm'n,* 221 U. S. 612; *Wilson* v. *New,* 243 U. S. 332; *Texas & New Orleans R. Co.* v. *Railway Clerks,* 281 U. S. 548.

The argument that a pension measure, however sound and reasonable as such, is *per se* outside the pale of the regulation of interstate carriers, because such a plan could not possibly have a reasonable relation to the ends which Congress is entitled to serve, is largely answered by the practice of the carriers themselves. Following precedents long established in Europe, certain railroad companies in the United States set up voluntary pension systems many years ago. It appears that the first of these was established in 1884, another was adpoted in 1900. By 1910, formal pension plans covered 50 per cent of all railroad employees, and, by 1927, over 82 per cent. In establishing these plans the carriers were not contemplating the payment of a largess unrelated to legitimate transportation ends. Their witnesses say the carriers aimed at loyalty and continuity of service. However limited their motives, they acted upon business principles. Pension plans were not deemed to be essentially foreign to the proper conduct of their enterprises. But if retirement or pension plans are not *per se* unrelated to the government

of transportation operations, Congress could consider such plans, examine their utility, and reach its own conclusions. If the subject matter was open to consideration, Congress was not limited to the particular motives which inspired the plans of the carriers.

The Government stresses the importance of facilitating the retirement of superannuated employees. The argument points to the conclusions of expert students as given in the testimony below, and to the reports of investigating committees and boards of leading business organizations. *"Employees' Retirement Annuities,"* Chamber of Commerce of the United States, 1932, pp. 7, 8; *" Elements of Industrial Pension Plan,"* National Industrial Conference Board, 1931, pp. 8, 10. Mr. Eastman, the Federal Coördinator of Transportation, in his affidavit on the hearing below, expressed the view that there was excessive superannuation among railroad employees. He says: " This excessive superannuation is detrimental to railroad service in several ways. Men who have grown old in the service decline in efficiency. The carrier pays in wages an amount out of proportion to the service rendered. These conditions exist upon the railroads at the present time. There is now a large body of superannuated employees in railroad service who, for the good of the service, ought to be retired. Pension systems, of one sort or another, have been in existence in the railroad industry for as long as 50 years. The need for them was recognized by the more progressive carriers at an early date. In late years particularly, with the voluntary systems in danger, the matter of retirement and pensions has been a crucial issue in railroad employment. Withdrawal or extensive curtailment of existing pensions in the railroad industry would impair the morale of railroad employees and play havoc with railroad labor relations. It would, in addition, increase the existing excessive superannuation among railroad employees and block the employment and promotion of younger men."

The carriers deny that there is excessive superannuation. They assert that the removal of older employees has no reasonable relation to either safety or efficiency. The opinion of the Court enters this field of controversy, reviews statistics as to the increase of safety and efficiency in operation during the period of the alleged increasing superannuation, and supports the finding that railroads are now operated more efficiently and safely than at any time in history. But that gratifying fact does not establish that further improvement is not needed or obtainable, or that a sound pension plan would not be of considerable benefit to the carriers' operations. At best, the question as to the extent of superannuation, and its effect, is a debatable one, and hence one upon which Congress was entitled to form a legislative judgment. As we said in *Radice* v. *New York,* 264 U. S. 292, 294: "Where the constitutional validity of a statute depends upon the existence of facts, courts must be cautious about reaching a conclusion respecting them contrary to that reached by the legislature; and if the question of what the facts establish be a fairly debatable one, it is not permissible for the judge to set up his opinion in respect of it against the opinion of the lawmaker." See *Stephenson* v. *Binford,* 287 U. S. 251, 272.

Laying that question on one side, I think that it is clear that the morale of railroad employees has an important bearing upon the efficiency of the transportation service, and that a reasonable pension plan by its assurance of security is an appropriate means to that end. Nor should such a plan be removed from the reach of constitutional power by classing it with a variety of conceivable benefits which have no such close and substantial relation to the terms and conditions of employment. The appropriate relation of the exercise of constitutional power to the legitimate objects of that power is always a subject of judicial scrutiny. With approximately 82 per cent of

railroad employees, 90 per cent of those employed in cable, telephone and telegraph companies, and about one-half of those in the service of electric railways, light, heat and power companies under formal pension plans,[1] with the extensive recognition by national, state and local governments of the benefit of retirement and pension systems for public employees in the interest of both efficiency and economy,[2] it is evident that there is a widespread conviction that the assurance of security through a pension plan for retired employees is closely and substantially related to the proper conduct of business enterprises.

But with respect to the carriers' plans, we are told that as they were framed in the desire to promote loyalty and continuity of service in the employment of particular carriers, the accruing advantages were due to the fact that the plans were of a voluntary character. In short, that the reaction of the employees would be simply one of gratitude for an act of grace. I find no adequate basis for a conclusion that the advantages of a pension plan can be only such as the carriers contemplated or that the benefit which may accrue to the service from a sense of security on the part of employees should be disregarded. In that aspect, it would be the fact that protection was assured, and not the motive in supplying it, which would produce the desired result. That benefit would not be lost because the sense of security was fostered by a pension plan enforced as an act of justice. Indeed, voluntary plans may have the defect of being voluntary, of being subject to curtailment or withdrawal at will. And the danger of such curtailment or abandonment, with the consequent frustration of the hopes of a vast number of railroad workers and its effect upon labor relations in this enterprise of

[1] Latimer, "Industrial Pension Plans," 1932, Vol. I, p. 55.

[2] " Public Service Retirement Systems," Bureau of Labor Statistics (U. S.) Bulletin No. 477, 1929.

outstanding national importance, might well be considered as an additional reason for the adoption of a compulsory plan. *Wilson* v. *New, supra,* pp. 347, 348. There was also testimony (by Mr. Eastman) that "the experience with the voluntary pension systems has been unsatisfactory," that "the depression brought clearly to light their many weaknesses and uncertainties."

The argument in relation to voluntary plans discloses the fundamental contention on the question of constitutional authority. In substance, it is that the relation of the carriers and their employees is the subject of contract; that the contract prescribes the work and the compensation; and that a compulsory pension plan is an attempt for social ends to impose upon the relation non-contractual incidents in order to insure to employees protection in their old age. And this is said to lie outside the power of Congress in the government of interstate commerce. Congress may, indeed, it seems to be assumed, compel the elimination of aged employees. A retirement act for that purpose might be passed. But not a pension act. The government's power is conceived to be limited to a requirement that the railroads dismiss their superannuated employees, throwing them out helpless, without any reasonable provision for their protection.

The argument pays insufficient attention to the responsibilities which inhere in the carriers' enterprise. Those responsibilities, growing out of their relation to their employees, cannot be regarded as confined to the contractual engagement. The range of existing federal regulation of interstate carriers affords many illustrations of the imposition upon the employer-employee relation of noncontractual incidents for social ends. A close analogy to the provision of a pension plan is suggested by the familiar examples of compensation acts. The power of Congress to pass a compensation act to govern interstate carriers and their employees engaged in interstate

commerce does not seem to be questioned. The carriers might thus be compelled to provide appropriate compensation for injuries or death of employees, although caused without fault on the carriers' part. A thorough examination of the question of constitutional authority to adopt such a compulsory measure was made some years ago by a commission constituted under a Joint Resolution of Congress, of which Senator Sutherland (now Mr. Justice Sutherland) was chairman.[3] 36 Stat. 884. Its elaborate and unanimous report, transmitted to Congress by President Taft with his complete approval, considered the constitutional question in all aspects, upheld the congressional power, and proposed its exercise. Sen. Doc. No. 338, 62d Cong. 2d sess. Among the principles announced was that "If the proposed legislation effectuates any constitutional power, it is not rendered unconstitutional because to a greater or less extent it may accomplish or tend to accomplish some other result which, as a separate and independent matter, would be wholly beyond the power of Congress to deal with." *Id.*, p. 26. The legislation was deemed to be a regulation of interstate commerce because, among other specified things, of its effect on the state of mind of the employee. On this point the commission said: "By insuring to every employee engaged in interstate commerce definite compensation in case of his injury, and to his widow and children, or other dependents, in case of his death, irrespective of fault, the mind of the employee will, to a great extent, be relieved from anxiety for the future and he will be able to render better and more efficient, and consequently safer, service." *Id.*, p. 28. The commission explicitly pointed out that the legislation which it recommended was not based

---

[3] The members of the commission were Senators George Sutherland and George E. Chamberlain, Representatives William G. Brantley and Reuben O. Moon, William C. Brown, president of the New York Central lines, and D. L. Cease, the editor of The Railroad Trainman.

on any wrong or neglect of the carrier, "but upon the *fact* of injury resulting from accident in the course of the employment," that is, that accidents should be regarded "as risks of the industry." *Id.*, p. 15. The circumstance that such a compensation measure has not been enacted by Congress is readily attributable to questions of policy rather than to any doubt of constitutional power.

The effort to dispose of the analogy serves only to make it the more impressive. Compensation acts are said to be a response to the demands which inhere in the development of industry, requiring new measures for the protection of employees. But pension measures are a similar response. If Congress may supply a uniform rule in the one case, why not in the other? If affording certainty of protection is deemed to be an aid to efficiency, why should that consideration be ruled out with respect to retirement allowances and be admitted to support compensation allowances for accidents which happen in the absence of fault? Compensation acts do not simply readjust old burdens and benefits. They add new ones, outside and beyond former burdens and benefits, and thus in truth add a new incident to the relation of employer and employee.

When we go to the heart of the subject, we find that compensation and pension measures for employees rest upon similar basic considerations. In the case of compensation acts, the carrier has performed its contract with the employee, has paid the agreed wages, has done its best to protect the employee from injury, is guilty of no neglect, but yet is made liable for compensation for injury or for death which ends the possibility of future service, because in the development of modern enterprises, in which accidents are inevitable, it has come to be recognized that the industry itself should bear its attendant risks. *New York Central R. Co.* v. *White*, 243 U. S. 188; *Mountain Timber Co.* v. *Washington*, 243 U. S. 219. An

attempted distinction as to pension measures for employees retired by reason of age, because old age is not in itself a consequence of employment, is but superficial. The common judgment takes note of the fact that the retirement of workers by reason of incapacity due to advancing years is an incident of employment and that a fair consideration of their plight justifies retirement allowances as a feature of the service to which they have long been devoted. This is recognized as especially fitting in the case of large industrial enterprises, and of municipal undertakings such as police and fire protection, where there are stable conditions of employment in which workers normally continue so long as they are able to give service and should be retired when efficiency is impaired by age. What sound distinction, from a constitutional standpoint, is there between compelling reasonable compensation for those injured without any fault of the employer, and requiring a fair allowance for those who practically give their lives to the service and are incapacitated by the wear and tear of time, the attrition of the years? I perceive no constitutional ground upon which the one can be upheld and the other condemned.

The fundamental consideration which supports this type of legislation is that industry should take care of its human wastage, whether that is due to accident or age. That view cannot be dismissed as arbitrary or capricious. It is a reasoned conviction based upon abundant experience. The expression of that conviction in law is regulation. When expressed in the government of interstate carriers, with respect to their employees likewise engaged in interstate commerce, it is a regulation of that commerce. As such, so far as the subject matter is concerned, the commerce clause should be held applicable.

*Second.* With this opinion as to the validity of a pension measure if it is reasonably conceived, we are brought to the question of due process,—whether the particular pro-

visions of the retirement act now before us violate the requirement of due process which, under the Fifth Amendment, limits the exercise of the commerce power.

The most serious of the objections, sustained by the Court on this score, relates to the establishment of a unitary or pooling system for all railroads. It is said that in this respect the plan disregards the private and separate ownership of the respective carriers, treating them as a single employer, and illustrations are given to show that unequal burdens are thus imposed.

The objection encounters previous decisions of this Court. We have sustained a unitary or group system under state compensation acts against the argument under the due process clause of the Fourteenth Amendment. *Mountain Timber Co. v. Washington, supra.* The Washington compensation act established a state fund for the compensation of workmen injured in hazardous employment, and the fund was maintained by compulsory contributions from employers in such industries. While classes of industries were established, each class was made liable for the accidents occurring in that class. The Court described the law as so operating that " the enforced contributions of the employer are to be made whether injuries have befallen his own employees or not, so that however prudently one may manage his business, even to the point of immunity to his employees from accidental injury or death, he nevertheless is required to make periodical contributions to a fund for making compensation to the injured employees of his perhaps negligent competitors." *Id.*, pp. 236, 237. The statute was sustained in the view that its provisions did not rest upon the wrong or neglect of employers, but upon the responsibility which was deemed to attach to those who conducted such industries. The Court concluded " that the State acted within its power in declaring that no employer should conduct such an industry without making

stated and fairly apportioned contributions adequate to maintain a public fund for indemnifying injured employees and the dependents of those killed, irrespective of the particular plant in which the accident might happen to occur." *Id.*, p. 244. We followed the reasoning which had led to the upholding of state laws imposing assessments on state banks generally in order to create a guaranty fund to make good the losses of deposits in insolvent banks. *Noble State Bank* v. *Haskell*, 219 U. S. 104. See *Abie State Bank* v. *Bryan*, 282 U. S. 765.

But, aside from these analogies, this Court has directly sustained the grouping of railroads for the purpose of regulation in enforcing a common policy deemed to be essential to an adequate national system of transportation, even though it resulted in taking earnings of a strong road to help a weak one. This was the effect of the recapture clause of Transportation Act, 1920, which required carriers to contribute their earnings in excess of a certain amount in order to provide a fund to be used by the Interstate Commerce Commission in making loans to other carriers. *Dayton-Goose Creek Ry. Co.* v. *United States*, 263 U. S. 456. A distinction is sought to be made because the carriers, which were required to contribute, were permitted to retain a reasonable return upon their property. But what the strong roads were compelled to contribute were their own earnings resulting from just and reasonable rates,—earnings which they were as clearly entitled to retain for their own benefit as the moneys which in the present instance are to be devoted to retirement allowances. The fact that the recapture provisions failed of their purpose and have been abandoned does not disturb the decision as to constitutional power. The principle that was applied had been made clear in the *New England Divisions Case*, 261 U. S. 184. Transportation Act, 1920, had introduced into the federal legislation a new railroad policy. To attain its purpose, " new rights,

new obligations, new machinery, were created." "To preserve for the nation substantially the whole transportation system was deemed important." "The existence of the varying needs of the several lines and of their widely varying earning power was fully realized." To attain the object "two new devices were adopted: the group system of rate making and the division of joint rates in the public interest. Through the former, weak railroads were to be helped by recapture from prosperous competitors of surplus revenues. Through the latter, the weak were to be helped by preventing needed revenue from passing to prosperous connections. Thus, by marshaling the revenues, partly through capital account, it was planned to distribute augmented earnings, largely in proportion to the carriers' needs." *Id.,* pp. 189–191.

This object of adequately maintaining the whole transportation system may be served in more than these two ways. The underlying principle is that Congress has the power to treat the transportation system of the country as a unit for the purpose of regulation in the public interest, so long as particular railroad properties are not subjected to confiscation. In the light of that principle, and of applications which have been held valid, I am unable to see that the establishment of a unitary system of retirement allowances for employees is beyond constitutional authority. Congress was entitled to weigh the advantages of such a system, as against inequalities which it would inevitably produce, and reach a conclusion as to the policy best suited to the needs of the country. See *Atlantic Coast Line R. Co.* v. *Riverside Mills,* 219 U. S. 186, 203; *Railroad Commission* v. *Southern Pacific Co.,* 264 U. S. 331, 343, 344.

*Third.* Questions are raised as to the classes of persons to be benefited. In considering these objections we should have regard to the explicit provision of the Act as to severability. It states that if "any provision," "or the

388

application thereof to any person or circumstances," is held invalid, " the remainder of the Act or application of such provision to other persons or circumstances shall not be affected." This, of course, does not permit us to rewrite the statute but it does allow the excision of invalid provisions, or inclusions, which can be severed without destroying its structure.

(1) The court below held the Act to be invalid in the view that its provisions were extended to persons not engaged in interstate commerce. In the special findings, classes of persons were listed, numbering 211,107, which were thought to fall within that description. It is manifest that the list was prepared under a misapprehension of the extent of the authority of Congress with respect to employees of interstate carriers and of the application of the decision in the first *Employers' Liability Cases,* 207 U. S. 463. Large numbers of employees were thus deemed to be improperly included whose work, while not immediately connected with the movement of traffic, did have such relation to the activities of the carriers in interstate commerce as to bring them within the range of congressional power. Thus the list embraced general officers and their staffs who were not in the operating departments connected with transportation, employees who dealt with the receipt and disbursement of moneys, some 86,493 employees in the maintenance-of-equipment departments, who were engaged in the reconstruction or major repair of equipment, withdrawn for that purpose from service, such as locomotives, cars, platform trucks, frogs, switches, etc., as distinguished from light or running repairs, and 36,996 employees whose duties lay in auditing, accounting, and bookkeeping. It should be observed that the decisions under the Second Employers' Liability Act of 1908, with respect to the necessity of the employee being engaged at the time of his injury in interstate transportation or in work so closely related to transportation as to

be a part of it, are based upon the limitations of that statute and do not define the scope of constitutional authority as to employees of interstate carriers. *Illinois Central R. Co.* v. *Behrens,* 233 U. S. 473, 477; *Chicago & Northwestern Ry. Co.* v. *Bolle,* 284 U. S. 74, 78.

Interstate carriers cannot conduct their interstate operations without general officers and their staffs, without departments for major repairs and those for administering finances and keeping accounts. General management is as important to the interstate commerce of the carriers as is the immediate supervision of traffic, and the proper maintenance of equipment and the handling of moneys and the keeping of books are as necessary as the loading and moving of cars. In the administration of the Act there would be ample opportunity to make all necessary distinctions between employees engaged in interstate commerce and any others who might be found to be otherwise exclusively employed, so as to exclude the latter from its benefits without impairing the general operation of the Act.

(2) A more serious objection relates to the eligibility for allowances of all those who were in the service within one year prior to the enactment, although they may never be reëmployed. Such persons may have been discharged for cause; in any event, for one reason or another, they had left the service and may not return.

I agree with the conclusion that the requirement that the carriers shall pay retiring allowances to such persons is arbitrary and beyond the power of Congress. But I think it clear that the provision for their benefit is within the clause as to severability. That application of the Act may be condemned and such persons may be excluded from benefits without destroying the measure as a whole.

*Fourth.* Other questions relate to the details of the pension plan—principally with respect to the basis of the retirement allowances and the method of their computation.

With the excision of those whose employment was terminated before the Act was passed, the plan would cover those in carrier service at that time and those subsequently employed. Retirement is compulsory at the age of 65, but the service may be extended by agreement for successive periods of one year each until the age of 70. An employee may retire upon completing 30 years of service, but in such case provision is made for reducing the annuity by one-fifteenth for each year below the age of 65. Annuities are calculated by applying graduated percentages of the employee's average monthly compensation (excluding all over $300) to the number of years of his service, not exceeding 30. The maximum annuity thus payable would be $1440, and to receive that amount, it would be necessary for the employee to have been in service 30 years and to have attained the age of 65, and to have been paid an average monthly compensation of $300. Contributions to the pension fund are to be made by employees of a certain percentage of their compensation and the contribution of each carrier is to be twice that of its employees.

An examination of pension plans in operation reveals a variety of possible methods, and Congress was entitled to make its choice. As a basis for the allowance, Congress could select either age or length of service or both. In the selection of any age, or any period of service, anomalies would inevitably occur in particular applications. Extreme illustrations can always be given of the application of regulations which require the drawing of a line with respect to age, time, distances, weights, sizes, etc. To deny the right to select such criteria, or to make scientific precision a criterion of constitutional authority, would be to make impossible the practical exercise of power. Compare *Sproles* v. *Binford*, 286 U. S. 374, 388, 389; *Stanley* v. *Public Utilities Commission of Maine*, *ante*, p. 76. Whatever may be said of the capacity of many men after they have attained 65 years, the fixing

of that age or a period of 30 years' service, or a combination of both, for general application, cannot be regarded as an arbitrary choice for railroad employees.

The principal criticism is the bringing into the reckoning of past periods of service—antedating the passage of the Act. The objection is strongly put with respect to those who were in the employment of the carriers when the Act was passed, and it is even more earnestly urged as to those who had left the service and later are reëmployed. It is said that the reckoning of their prior periods of employment compels payment for services fully completed and paid for before the enactment. But it seems to be assumed that Congress could compel the dismissal of aged employees, and if it has that power and also has power to establish a pension system, I can find no ground for erecting a constitutional limitation which would make it impossible to provide for employees who were thus severed from the service. The question simply is—What is a fair basis for computing a retirement allowance? Is the plan adopted by Congress destitute of rational support?

Congress could have provided for a retirement allowance in a flat sum, or could have based it upon the amount of compensation which the employee was receiving at the time of retirement, or upon the amount he had received for the preceding year or his average compensation of a longer time. Selecting a period not to exceed 30 years, or the period of service prior to age 65, merely gives a measure for the computation of the retirement allowance. It is in no proper sense a payment for the prior service, any more than would be the fixing of the allowance at a flat figure or on the basis of the last compensation received. The result in dollars and cents might not vary to any great extent whatever method of calculation was chosen.

The power committed to Congress to govern interstate commerce does not require that its government should be wise, much less that it should be perfect. The power

392

implies a broad discretion and thus permits a wide range even of mistakes. Expert discussion of pension plans reveals different views of the manner in which they should be set up and a close study of advisable methods is in progress. It is not our province to enter that field, and I am not persuaded that Congress in entering it for the purpose of regulating interstate carriers, has transcended the limits of the authority which the Constitution confers.

I think the decree should be reversed.

I am authorized to state that MR. JUSTICE BRANDEIS, MR. JUSTICE STONE, and MR. JUSTICE CARDOZO join in this opinion.

