**UNITED STATES (NOYES, Com'r of Agri-
culture and Markets, Intervener) v. ROCK
ROYAL CO-OP., Inc., et al.***

District Court, N. D. New York.
Feb. 23, 1939.

John S. L. Yost, Charles J. McCarthy, and Harold L. Schilz, Sp. Assts. to Atty. Gen., E. O. Mather, Sr. Atty., Department of Agriculture, of Washington, D. C., Ralph L. Emmons, U. S. Atty., of Syracuse, N. Y., Milo R. Kniffen, Counsel, Department of Agriculture and Markets of State of New York, of Cobleskill, N. Y., Louis S. Wallach, Asst. Counsel, of Brooklyn, N. Y., Seward A. Miller, of New York City, Edward Schoeneck, of Syracuse, N. Y., and Paul J. McCauley, of New York City, for plaintiff Dairymen's League Co-operative.

Edmund F. Cooke and Richard Cooke, both of Buffalo, N. Y., for plaintiff Metropolitan Co-operative Milk Producers Bargaining Agency, Inc.

Willard R. Pratt, of Utica, N. Y., Charles W. Jenkins, of Deposit, N. Y., and Haskell & Foley, of Cortland, N. Y., for defendants.

Samuel Rubinton, of Brooklyn, N. Y. (of counsel), for Rock Royal Co-operative, Inc.

Leonard Acker, of Brooklyn, N. Y. (of counsel), for Central New York Co-operative.

COOPER, District Judge.

This suit was brought by the Secretary of Agriculture in the name of the United States, for a mandatory injunction to compel the defendants to comply with the provisions of Order No. 27 issued by the Secretary on August 5, 1938, effective September 1, 1938.

The order was issued by the Secretary to make effective the provisions of the Agricultural Marketing Agreement Act as amended in 1937.

The order is concerned only with milk produced by producers approved by the City of New York for sale in interstate commerce in the Metropolitan milk marketing area, consisting of the counties in New York City and the Counties of Nassau, Suffolk and Westchester.

Order 27, among other things, provides for the payment, by non-co-operative dealers, called proprietary handlers, who buy milk from the producers, of a minimum price to the producers.

It also provides for the payment by all handlers, proprietary or co-operative, under varying conditions, of certain moneys into a milk pool or equalization fund, called Producers Settlement Fund, and also for withdrawals from that fund, chiefly by co-operatives.

This suit is brought to compel payment by the defendants into this Producers Settlement Fund of the following sums in compliance with the terms of Order No. 27.

| | Sept. | Oct. | Nov. |
|---|---|---|---|
| Jetter Dairy Co. | Paid | $14,616.05 | $ 9,039.77 |
| Rock Royal, | $3,616.56 | 3,058.24 | 1,508.74 |
| Schuyler Junction | 1,603.00 | 1,337.40 | 757.64 |
| Central New York | 20,115.56 | 19,581.60 | 11,069.13 |

Similar amounts are claimed to be due for each succeeding month.

The State of New York has a statute called the Rogers-Allen Law similar to the Federal Act to cover milk produced by like approved producers for sale in intra-state commerce in the Metropolitan milk marketing area and under authority thereof the Commissioner of Agriculture, Farms and Markets of New York State issued his order No. 126.

The two orders are complementary and are administered by the same administrator appointed by each sovereignty.

The State Commissioner intervened as party plaintiff with the consent of the original plaintiff as did the Dairymen's League Co-operative Association, Inc., and also the Metropolitan Co-operative Milk Producers Bargaining Agency, Inc. But the latter two were allowed to intervene only to help the original plaintiff to defend against acts charged against them by the defendants relating to the referendum, and other things more fully referred to hereinafter.

Three of the four defendants are incorporated co-operative associations and the fourth, the Jetter Dairy Company, is a proprietary handler.

It is not questioned here as the Court understands it, but that the milk of all four defendants reaches the Metropolitan marketing area through the channels of interstate commerce and that they are subject to Federal Order 27 if the Federal Statute and Order 27 are valid and are not subject to State Order No. 126.

So the decision here is based on the Federal Order 27 and little attention will be given to State Order No. 126.

Order No. 27 is lengthy and somewhat complicated. That order is attached to and made a part of this memorandum. Parts of it will be referred to herein.

The Secretary contends that Order 27 was appropriate and necessary to effectuate the provisions of the statute and asks that the defendants be compelled to comply with it by paying the aforesaid sums.

The defendants assert, on various grounds to be more particularly referred to later herein, that the order is invalid, that its approval in the referendum of producers was procured by misrepresentation of its terms, that its terms, operation and effect, and the statute under which it was issued, are so discriminatory that it will confiscate the defendants' property, if enforced, and both statute and order are unconstitutional in operation and effect.

The statute involved in the present case under which the Secretary of Agriculture purported to issue Marketing Order No. 27 is the Agricultural Marketing Agreement Act of 1937, Act of June 3, 1937, Public No. 137, 75th Congress, 50 Stat. 246, 7 U.S.C.A. § 601 et seq.

That act re-enacts and amends some of the provisions of the Agricultural Adjustment Act of 1933, 48 Stat. 31, as amended by the Act of August 24, 1935, 49 Stat. 750.

The purpose of the act is set forth in the "declaration of policy" contained in section 2 of the Act, 7 U.S.C.A. § 601. That purpose is to establish prices to farmers at a level which will give agricultural commodities a purchasing power, in relation to articles that farmers buy, equivalent to the purchasing power possessed by such commodities in the so called "base period".

The attainment of the farmers' purchasing power at such level is to be had by creating and maintaining orderly marketing conditions for agricultural commodities in interstate commerce through the exercise by the Secretary of Agriculture of the powers conferred by the Act.

The goal sought through the act is to regain for the farmers the favorable financial conditions which they enjoyed without any economic or marketing control during the base period which was about 25 years ago and before the World War.

The regulation of marketing conditions in agricultural commodities in interstate commerce through the machinery provided in the Act is merely a means of reaching and thereafter maintaining the goal sought. The act is in no sense an emergency measure but is to continue until the Secretary determines that the exercise of the powers therein conferred is no longer necessary or, possibly, is ineffective to obtain the desired object.

The means provided for attaining this object is the issuance by the Secretary of Agriculture of orders applicable to persons engaged in the handling in Interstate Commerce of certain agricultural commodities. Milk is one of the specified commodities. Section 8c (2), 7 U.S.C.A. § 608c (2).

Orders are to be issued when the Secretary has reason to believe that the issuance of the order will tend to effectuate the declared policy of the act with respect to the particular commodity involved when he so finds upon evidence introduced at a hearing of which he has given due notice. Section 8c (3,4). Such an order may be issued with respect to the commodity if the handlers of not less than 50% of the volume of such commodity produced or marketed out of the particular area defined in the order, shall sign a marketing agreement which regulates the handling of the commodity in the manner provided in the order. Section 8c (8).

Should 50% of such handlers refuse to sign such an agreement an order may nevertheless be issued if the Secretary determines that their failure so to sign the marketing agreement tends to prevent effectuation of the declared policy of the act and that the issuance of the order is the only practical means of advancing the interests of the producers. Section 8c (9).

Whether an order is issued in connection with a marketing agreement under Section 8c (8) or without such agreement under Section 8c (9), the order must be approved by two-thirds of the producers of such commodity or the producers of two-thirds of the volume thereof, who during a representative period to be determined by the Secretary, were engaged in the production of such commodity for sale in the marketing area to which the order applied. Section 8c (8 and 9).

In order to determine that approval, the Secretary may conduct a referendum of producers, and if two-thirds of those represented in the referendum approve, that is sufficient. Section 8c (19).

In conducting such referendum the secretary shall consider the approval or disapproval by any co-operative association

of producers bona fide engaged in marketing the commodity or product thereof, covered by such order, or in rendering services for or advancing the interests of the producers of such commodity, as the approval or disapproval of the producers who are members of, stockholders in, or under contract with such co-operative association of producers. Section 8c (12).

A number of terms and conditions are set forth in the act, one or more of which must be contained in all orders.

These terms and conditions include provisions prohibiting unfair methods of competition and unfair trade practices and, except in the case of fluid milk or cream to be sold for consumption in fluid form, provision for sale of commodities only to be at prices fixed by the handlers and also a provision for the selection of the agency to administer the order.

Besides these general terms common to all orders, the Statute states particular terms or conditions to be included in orders relating to milk and its products. Section 8c (5).

None of these terms and conditions need be included in the order but the order must contain at least one of them.

The first term provides for classifying milk in accordance with the form or the purpose for which it is used, fixing a minimum price for each such use classification, which all handlers shall pay for milk purchased from producers or associations of producers, and a time when payment shall be made. Section 8c (5) (A). The prices so fixed are to be uniform for each classification of milk, subject, however, to certain differentials. The classification of milk is to be determined not by the character of the milk sold by the farmer or the handler but by the form in which or the purpose for which the handler uses it. The farmers all sell milk in fluid form varying no doubt as to the grade and quality but still fluid milk. The handler may resell or use such milk in different forms for different purposes. Some he may sell as fluid milk, some he may convert into butter or cream and some he may manufacture into ice cream or other manufactured milk products. Its subsequent use determines the class into which falls the milk he buys from the farmer and the price he has to pay.

The second term or condition is designed to secure for each farmer a uniform price for all the milk he sells regardless of the classification in which it falls. Section 8c (5) (B).

This equalization provision may take one of two forms. It may provide for the payment of uniform prices either (1) to all producers selling to the same handler, or (2) to all producers selling to all handlers, irrespective of the uses made of the milk by the particular handler to whom it is delivered. In either case the uniform prices are subject to certain adjustments for market differentials, grade and quality of the milk and point of delivery of the milk. These two alternative provisions may be designated as "dealer equalization" and "market equalization". The first alternative, that of "dealer equalization" secures to the producers selling to one dealer a uniform price for the milk they deliver to him. If different rates have been fixed for different classifications of milk, the dealer may not attribute all the milk of one class he buys to a particular farmer or group of farmers, and all the milk of another class to other farmers. He must allocate among all his farmers equally all classifications of milk he purchases. The second alternative, that of "market equalization", secures to all farmers in the market covered by the order a uniform price for all milk delivered. It is immaterial that the particular handler, to whom a farmer sells, buys milk of only one classification. Each farmer in the market is to be paid a price based on his pro rata share of all classifications of milk purchased by all dealers in the production area. The principle of allocation is extended from allocation among all producers of each dealer to allocation among all producers selling to all dealers. In both cases, however, the uniform prices may be subject to certain adjustments.

It will be seen that the first term providing for payment by the handler on the basis of the use to which he puts the milk purchased, and the second term, providing for receipt by the farmer of a uniform price regardless of the use to which the particular milk he sells is put, appear to be inconsistent and to leave open a gap between the amount the handler must pay and the amount the farmer is to receive. This gap will not appear if the provision for uniform receipts by farmers is that of "dealer equalization". The handler will pay to all his farmers as a group a total amount based on his total purchases of milk of all classifications. That total amount will be

allocated among all his farmers. But if the provision for uniform receipts is that of "market equalization" the gap is clear. The handler is to pay only on the basis of his own use and the farmer is to receive on the basis of the use of the entire market. The handler may, therefore, have to pay more or less than his farmers are to receive.

This gap is bridged by the third term that may be included in a milk order, Section 8c (5) (C), providing a method for making adjustments in payments as among handlers to the end that the total sums paid by each handler shall equal the "value" of the milk purchased by him at the rates fixed in accordance with the first term. By virtue of this provision in any order, handlers, who on the basis of their own use, should pay more than the amount their farmers are entitled to receive, may be required to pay the excess to other handlers who, on the basis of their own use, should pay less than their farmers are entitled to receive. The first term, therefore, fixes the "value" that the handler "owes" for his milk. That "value" may be greater or less than the "price" he has to pay his farmers; fixed in accordance with the second term. If greater, he pays the excess to other handlers. If less, he pays the required "price" to his farmers and collects the difference from other handlers whose "value" was greater than the "price".

The fourth term, Section 8c (5) (D), provides that producers who were not regularly selling milk during a thirty day period prior to the effective date of the order shall be paid at the rate for the lowest use classification for a period of two calendar months.

The fifth term, Section 8c (5) (E), is a provision for rendering market information and for verification of weights, sampling and testing of milk sold by producers, for whom such services are not rendered by a co-operative marketing association qualified under the "Capper Volstead Act." Appropriate deductions to cover these services are to be made from payments to producers.

The sixth term, Section 8c (5) (F), provides that co-operative marketing associations, qualified under the "Capper-Volstead Act", 7 U.S.C.A. §§ 451–457, may blend the proceeds of all sales in all markets in all use classifications and distribute to producers in accordance with the contract between the association and its producers, thus in effect exempting such associations from the "market equalization" provisions which may be imposed upon competing handlers. The last term, Section 8c (5) (G), provides that no milk order shall prohibit or limit the marketing in the area covered by the order of milk produced in any production area in the United States.

Orders, once effective, may be terminated or suspended by the Secretary, whenever he finds that the order obstructs or does not tend to effectuate the declared purpose of the Act, Section 8c (16) (A), and must be terminated when termination is favored by a majority of producers engaged in production of the commodity for sale in the marketing area during a representative period, provided such majority have produced more than 50 per cent of the volume of the commodity, Section 8c (16) (B).

Violation of an order renders the handler subject to a fine. Section 8c (14). Jurisdiction is vested in the district courts to enforce, and to restrain violation of any order, regulation or agreement made pursuant to the Act. Section 8a (6).

A handler subject to an order may seek administrative relief by petition to the Secretary stating that an order or obligation imposed thereby is not in accordance with law and praying that it be modified or he be exempted from it. Section 8c (15) (A). The ruling of the Secretary, after hearing on the petition, is subject to review in equity in the District Courts. Any proceeding brought under Section 8a (6) to enforce the provisions of an order abate whenever a final decree is entered in proceedings to review the ruling of the Secretary on the petition. Section 8c (15) (B).

Order No. 27, in Article III classified milk in 9 classifications, viz., Classes I, II–A, II–B, III–A, III–B, III–C, III–D, IV–A and IV–B.

Class I may be called fluid milk.

Class II–A is cream with certain exceptions.

The remaining classes relate to various products made from fluid milk.

Article IV fixes the minimum prices for milk in the various classes with variations for certain months.

Article V relates to reports of handlers.

Article VI relates to the determination of uniform prices by formulas therein contained.

Article VII relates to payment to producers.

Article VII, Section 1, exempts co-operatives from paying the uniform price to their producers.

Article VII, Section 6, provides for certain service payments to all handlers who come within the provisions thereof.

Article VII, Section 7, provides for payment to the Producers Settlement Fund.

Article VII, Section 8, provides for payments out of the Producers Settlement Fund.

All of the defendants are handlers as defined in the order. None of them have facilities for the manufacture of milk products and none of them are engaged in marketing milk outside the marketing area.

The order established prices to be paid for milk according to its utilization. The price of milk for fluid consumption known as Class I is fixed arbitrarily, depending upon the market price of butter. The price of Class 2-A milk (cream for fluid consumption) is likewise fixed arbitrarily. The price for fluid milk has been $2.45 per cwt. since September 1, 1938.

Prices for milk manufactured into various milk products are the assumed values thereof, based on market prices of the products into which the milk is manufactured which products are sold in country wide competition. The prices for milk used in the manufacture of milk products is determined monthly by the Administrator by the use of formulae therefor contained in the order.

All handlers purchasing milk from producers are required to report to the Administrator monthly, a statement of the amounts of milk purchased by such handler, and the utilization thereof. Article V, Section 2.

Based on the reports of all handlers, the Administrator computes the total value of the milk of such handler, based on the prices provided in the order. Article VI, Section 7. The result of such computation is the "net pool obligation."

Upon these same reports, the Administrator computes a "uniform" price which is the average price payable to producers for milk for each month, subject to certain differentials in part referred to hereinafter. Article VI, Section 2. Such involves also subtracting certain special payments to handlers under Article VI, Sections 5 and 6.

Each handler, which is not a co-operative association of producers on or before the 25th of each month, is required to pay to each producer the "uniform price" for all milk delivered by producers during the preceding month and which was sold in the marketing area. Article VII, Section 1.

Co-operative associations which are handlers are not required to make payment for such milk delivered to them by producers at the "uniform price" or at any fixed or stated price.

All handlers are required to pay into the Producers Settlement Fund on or before the 18th day of each month the difference between $2.45 per cwt. and the uniform price for all Class 1 milk (fluid milk). Article VII, Sec. 8.

Handlers selling milk outside the marketing area are under no requirement to pay the producers the uniform price for such milk nor to pay into the Producers Settlement Fund the difference between the uniform price and the actual market value of such milk. Such handlers are permitted to "blend" prices paid or purported to have been paid for such milk sold in the outside market, with the uniform price announced by the Administrator for milk sold in the marketing area, thereby reducing the actual price paid to producers by such handlers for milk sold by them in the marketing area in competition with the defendant and others in like situation whose milk is sold entirely in the marketing area. This permits handlers selling in the outside market by blending milk so sold with milk sold in the marketing area to pay the producers at less than the order price and less than the actual value, if the price figured by the handlers for sales in outside markets (called "unpriced milk") is lower than the actual market value.

Co-operatives are not only exempted from paying the uniform price or any fixed portion thereof to producers, but are permitted to blend prices of milk received in the production area and sold in the outside marketing area.

Other discriminations in favor of co-operatives and large dealers are briefly referred to hereinafter.

The laudable purpose of the statute to procure for farmers prices for their milk commensurate with their purchasing power at specified periods of better balance of purchasing power is not criticized or con-

demned. Nor is there any denial that the production or sale of milk presents peculiar problems due in part to excess supply at certain times and almost scarcity at others.

The challenge is to the means set up in the statute and order for dealing with the conditions. These means constitute defendants claim such gross discrimination as to drive defendants out of business and confiscate their property by the arbitrary discrimination therein provided and without any lack of efficiency on the part of the defendants.

The defendants contend that the order was put forward by the Metropolitan Co-operative Milk Bargaining Agency in connection with the Dairymen's League, that it was designed for and has the effect of, in connection with the destructive marketing conditions in the Metropolitan area, driving out of business competitors not enjoying special price and other favorable arrangements with co-operatives; that the vote in the referendum of producers was brought about by misrepresentation as to the terms and effect of the order both on the part of agents of the Secretary of Agriculture and the State Commissioner, as well as by the Bargaining Agency and the Dairymen's League; that the referendum was thereby unfair and that the Dairymen's League alone cast two-thirds of the favorable votes cast.

Consideration will be given first to the legislation and the activities of the Bargaining Agency and the Dairymen's League in connection with the legislation and the preparation, promulgating and adoption of the order and the Referendum preceding its issuance by the Secretary.

The Rogers-Allen Law was enacted first in 1937 by the Legislature of the State of New York as Chapter 383 of the Laws of 1937. Its provisions, so far as they relate to milk, are similar to the provisions of the Agricultural Marketing Agreement as amended in 1937.

The amendments to the Federal Agricultural Marketing Agreement Act became effective on June 3, 1937. One of the amendments was the insertion in the act of Section 8c (19), providing for a Producers Referendum to determine whether or not an order is approved by two-thirds of the producers.

The intervening plaintiff, the Dairymen's League, in co-operation with the New York State Conference Board of Farm Organizations, of which it is the sole member representing milk producers, actively sponsored and supported the enactment of the Rogers-Allen Law.

After the enactment of the Rogers-Allen Law and almost immediately after the amendment of the Agricultural Marketing Agreement Act, viz., on or about the 7th of June, 1937, the Dairymen's League in conjunction with representatives of other co-operative organizations of the State, organized and incorporated the Metropolitan Co-operative Milk Producers Bargaining Agency, Inc., under the Co-operative Corporations Law of the State of New York. This Metropolitan Bargaining Agency consisted entirely of co-operative associations. Among its directors were several representatives of the Dairymen's League and Sheffield Producers Co-operative Ass'n, Inc., another large co-operative. While these two co-operatives never had a majority of the Board of Directors of the Bargaining Agency, it is clear that they exercised an important if not the dominating influence over the activities of the Bargaining Agency.

After the Incorporation of the Bargaining Agency in 1937, it set about inducing producers selling milk to proprietary handlers to form co-operatives for the purpose of joining the Bargaining Agency.

Many were so formed, including all three co-operatives of the producers delivering milk to the Defendant Jetter Dairy Company, though only one joined the Bargaining Agency. In some instances the Bargaining Agency advanced the fee for filing certificates of incorporation.

By June of 1938 there were 193 co-operative associations, most of which were members of the Bargaining Agency. The membership of these co-operatives included a very large percentage of all the producers. Many of these producers delivered milk to proprietary handlers and many to co-operative handlers.

In July 1937, Mr. E. Harmon, then connected with the Dairy Section of the Federal Department of Agriculture, and later Federal and State Administrator of orders 27 and 126, addressed a meeting of the Bargaining Agency relative to Federal Aid in a marketing program and spent three days monthly commencing with November 1937, at least some portion of which was spent in conference with the representatives of the Bargaining Agency and others about the marketing program.

About November 1st, 1937, the Bargaining Agency appointed a lawyers committee to draft a form of marketing agreement in order to regulate the sale of milk in New York City.

The original draft of such agreement and order was presented to the committee by Mr. Allen D. Miller, one of the Attorneys for the Dairymen's League.

Early in 1938, the Bargaining Agency presented to the Secretary of Agriculture of the United States and to the Commissioner of Agriculture and Markets of the State of New York, respectively, petitions for the issuance of Federal and State orders under the Agricultural and Marketing Agreement Act as amended in 1937 and of the State Rogers-Allen Law, and presented therewith proposed marketing agreement and proposed order regulating the handling of milk in the New York Metropolitan marketing area.

On April 29, 1938, the Secretary of Agriculture and the State Commissioner of Agriculture gave notice of hearings to be held on the proposed order and marketing agreement commencing May 16, 1938, at Albany and continuing at Malone on May 19th, Syracuse on May 18th, Elmira on May 19th, New York City on May 20th, 24th, 25th and 26th, and again at Albany June 3rd, 4th and 7th. Hearings were held at these places on these dates. The State Commissioner of Agriculture gave notice of like hearings on the like proposed state order. The hearings were conducted jointly by the Secretary of Agriculture and the State Commissioner of Agriculture through jointly appointed representatives.

Commencing in April 1938, radio addresses were made by representatives of the Bargaining Agency urging the adoption of the agreement and order. The Dairymen's League News and the Bargaining Agency publications, which were widely distributed among the milk producing farmers, urged the adoption of the proposed agreement and order.

The Secretary of Agriculture caused to be printed and sent out to producers and others the proposed order and agreement and also certain pamphlets.

The pamphlets purported to explain the meaning and intent of the agreement and order, the latter of which is complicated and not easily intelligible to the man of ordinary education.

The pamphlet "Explanation of the Federal State Marketing Plan" explaining order 27 states: "The hearings on the marketing agreement program were called at the request of the Metropolitan Cooperative Milk Producers Bargaining Agency, Inc., which claims a membership of co-operative associations representing over 40,000 producers."

Under the heading "Principal Provisions" appears this: "3. The establishment of minimum prices which handlers are required to pay producers of each class of milk."

Under "Producers to decide" appears this: "The definition (handler) specifically includes any cooperative association that operates plants or any co-operative association which causes milk to be delivered to plants of handlers and collects payment for such milk."

These provisions would undoubtedly lead the farmer-producer who received the pamphlet to believe that the uniform price would be paid to all producers by all handlers, proprietary or co-operative.

True, at a later point the pamphlet also says under "Uniform Pool Prices for Producers": "The order requires handlers to pay a uniform pool, or blended price calculated by the market administrator, to all producers delivering milk in any month unless the handler has received milk and sold it as Class I milk outside the marketing area. In such an instance the handler is required to pay the uniform price to each producer on that part of the milk received which is equal to the proportion of his milk to which minimum prices are applicable (it does not say, on that portion of the milk sold in the marketing area). For the remainder of each producer's milk the handler may pay such prices as he sees fit * * *."

But this is so involved and technical and appears on the last page of the pamphlet and would hardly be likely to lead the farmer to doubt that all producers would receive the minimum uniform price fixed by the Administration.

On or about August 5th, 1938, the Secretary of Agriculture tentatively approved the proposed order and a marketing agreement and sent it out to all handlers who would be subject to the provisions of the order, but the requisite 50% of the handlers failed to sign the marketing agreement.

The failure of 50% of the handlers to sign the marketing agreement required the approval of the order by two-thirds of the producers.

In August 1938, there were 54,111 producers whose dairies had been approved for Grade B. milk and 6109 for Grade A. milk or a total of 60,220 producers. They were located in New York, Pennsylvania, New Jersey, Massachusetts, Connecticut and Vermont.

About 420 country milk receiving stations for Grade B. milk and 86 for Grade A. milk or a total of 506 had been approved within this territory.

Of these the Dairymen's League operated 109 stations receiving milk from 11,391 producers. In addition thereto Bordens operated 65 approved milk receiving stations receiving milk from 8404 producers, all of which producers are members of the Dairymen's League. Bordens pays the Dairymen's League for milk received at these plants and the League pays the producers. The total number of producers included in the Dairymen's League Membership is upwards of 19,500. Dairymen's League does 34% of the milk business in the Metropolitan area.

Sheffield Farms, Inc., and Sheffield Farms Condensed Milk Company operate 87 approved milk receiving stations, receiving milk from 10,334 producers. The greater part of these producers deliver milk to Sheffield Farms, Inc., and are organized as a co-operative association known as Sheffield Producers Co-operative Association.

The Department of Agriculture of the United States in August 1938 issued a printed pamphlet under the Seal of the Department. In that pamphlet appears this:

"The Order (27) requires handlers to pay the uniform pool or blanket price, calculated by the market Administrator, to *all* producers delivering milk during any month unless the handler has received milk and sold it as Class I milk outside the marketing area * * *."

"Operation of the pool assures all handlers the same cost for milk sold in the marketing area, and for that milk assures payments to *all producers at uniform rate* except for the transportation and other differentials."

The last above paragraph quoted from the Government pamphlet is identical, word for word, with a paragraph contained in the Dairymen's League News of August 16, 1938, on Page 5.

These statements were incorrect. There is nothing in the order requiring payment of a uniform price to *all* producers or that the uniform price or any stated price or any price determinable under the order be paid to producers of the co-operative associations even for milk sold in the marketing area.

About this time a pamphlet issued by the Bargaining Agency was entitled "Mr. Dairyman—Save this Booklet." "The plan it explains may save your farm." On Page 1, under the heading "Principles Upon Which the Order is Based", appears this:

"The fundamental requirements of the industry which the order seeks to establish are five in number, viz.:

"1. An *equal* purchase price to be paid by *all* dealers for milk for the same use.

"2. An *equal* share to each producer of the benefits of the fluid market."

These are not accurate statements, for the Dairymen's League and other co-operatives are not required to pay a price equal to that paid by proprietary dealers.

Had this order been prepared by and for the Dairymen's League and other large co-operatives, it could hardly have been more favorable to them.

The Dairymen's League and Metropolitan Bargaining Agency publications were sent broadcast to producers urging them to vote for the order and assuring that they would receive a higher price than they had before received, and radio addresses to like effect were made.

Following this and on August 19, 1938, and for several days thereafter, the Secretary conducted a referendum. The State Commissioner of Agriculture conducted a referendum on State Order 126 at the same times and places.

The referendum was held at the times and places set forth in a schedule of polling places issued by the Secretary prior to the referendum, 308 polling places were designated, of which 233 were in New York, 35 in Pennsylvania and 16 in New Jersey.

Prior to the referendum there was sent to each known eligible producer a copy of the proposed order as issued by him on August 5th, the schedule of polling places and a pamphlet prepared by him entitled "Questions and Answers on the Federal

and State Milk Program for New York" and another pamphlet also prepared by him entitled "New York Milk, Explanation of Federal State Marketing Plan, contained in Order 27."

About 70,000 copies of these documents were sent through Federal and State Agencies to such producers.

The Metropolitan Bargaining Agency, whose largest and most influential member was the Dairymen's League, spent $108,637.91 to promote the adoption of this order covering salaries, publicity, printing, radio, etc., of which $12,385 was for radio addresses, $7,979, of which $12,385 was spent during the period between June 1 and September 1, during which time took place the last of the hearings and all the efforts to obtain signatures to the agreement by 50% of the handlers and to procure two-thirds of the producers to vote favorably on the referendum.

Prior to the referendum, a list of co-operative associations entitled to vote for their members was compiled. There were about 22 co-operatives found entitled to vote for their members. A letter was sent to each declaring the requirements for voting for their members. The 22 co-operatives cast 24,903 votes, of which 24,580 were in favor of the order and 323 were against it.

On the referendum held August 19th for several days, 45,664 votes were cast out of a total of 60,220 producers qualified to vote, but 7,017 of the 45,664 were rejected as invalid, leaving 38,627 valid votes. Of these 38,627, 33,663 votes or 87.1% were in favor of the issuance of the order. Of this 33,663 favorable votes, 22,297 or slightly more than two-thirds were cast by the Dairymen's League, Inc., alone, as a corporation for its members and other producers delivering milk to it. It had only about 19,500 members.

Of the 7,017 votes rejected as invalid, 5,110 votes were in favor and 1,437 against the order, making a total of 6,547. These were rejected because either the voters were members of co-operatives which had voted for their members or because they were not qualified to vote. 470 voters of 7,017 rejected failed to mark their ballots for or against the order.

Had it not been for these misrepresentations the order might not have had the approval of two-thirds of 38,627 votes counted as valid. 12,876 negative votes would have defeated the order. No one knows how these producers not voted by the co-operative associations would have voted had they but been correctly informed of the terms and effect of the order, nor how many of the 14,576 voters who did not vote at all nor the 7,017 whose votes were declared invalid would have voted had there been no misrepresentation of the terms and effect of the order.

The statute, Section 8c (12), 7 U.S.C.A. § 608c (12), is mandatory that the "Secretary shall consider the approval or disapproval by any cooperative association * * * as the approval or disapproval of the producers who are members of, stockholders in, or under contract with, such cooperative association of producers."

That this applies to approval upon a referendum is made clear by Section 8c (19).

So great was the power and voting strength of the Dairymen's League that no order which it opposed could be approved, for it controlled more than one-third of the entire number of producers entitled to vote.

This, urges the defendants, may explain why the order contains so many provisions claimed to be discriminatory in favor of large co-operatives and against proprietary handlers and small co-operatives.

Nor is it affected by the fact that some of the provisions in the order were the same as in previous but generally futile attempts by state action to beneficially regulate the milk industry.

This is not to be taken as suggesting that the Dairymen's League would not approve an order that was beneficial to the milk industry, but it must be an order which the Dairymen's League believes will be beneficial.

The Secretary has no right to exclude from voting any co-operative "engaged in marketing the commodity or product thereof * * * or in * * * advancing the interests of the producers of such commodity." Section 8c (12). Yet the Secretary found only 22 of 193 co-operatives who were entitled to and desired to vote for its members.

The defendant, Schuyler Junction, N. Y., Milk Shed Co-operative made no application to the Secretary for qualification to vote for its members and did not apply for a co-operative ballot and when it attempted through its president to vote in the referendum for its members the

544

president was told that he could not do so. Upon his insistence that his ballot be taken, it was taken but the president was told that it would not be counted. This was probably error. The statute fixes the qualification for co-operatives and no application is necessary. The burden seems to be on the Secretary to ascertain whether a co-operative meets the requirements of the statute and he may not make any additional qualifications such as applying for the right to vote or for a ballot.

The statute says the Secretary "shall" regard the approval or disapproval of a co-operative which complies with the statutory requirements. There seems no reason to doubt that Schuyler Junction Co-operative was entitled to vote and its vote should have been received and counted.

It seems that letters under date of July 8, 1938 (exhibit 14 to Stip.), purporting to be authorized and directed by the Federal Secretary and State Commissioner of Agriculture were sent to these 193 co-operatives or so many of them as were then known to exist. The letters said: "It is expected that simultaneous referenda will be conducted by the Secretary and Commissioner to ascertain if and when such order is perfected for the New York Market."

Certain information and requirements were sought from and presented to these co-operatives, at least some of which was not necessary to determine their right to vote.

In any event they were required to furnish the required information, determine their intention to vote for their members and have such information in the hands of the representatives of the Secretary at Washington and the Commissioner at Albany not later than July 16, 1938. The co-operatives were in the same letter notified: "In the event the requested information is not submitted, or the Secretary determines that such association is not qualified, the member-producer will be given an opportunity to vote individually and any vote submitted by such co-operative will be disregarded."

Here we have the co-operatives required to give information and determine within eight days, less time out for transportation of mail from Washington and to country districts and back to Washington, whether they favored an order not yet definitely known and whether they wished to vote as a co-operative for or against such order.

Assume four days for transportation (two days each way), that leaves four days for the collection of the information, calling meetings of directors and determination whether the co-operative would vote for its members on an unknown order and in a referendum not yet called and not held within a month thereafter. It is not surprising that only 54 out of the 193 co-operatives replied within this limited time and that only 22 had time to determine and so inform the Secretary and the Commissioner that they would vote for their members.

It is reasonably clear that the producers were led to believe that equal uniform prices for all producers would be received under order No. 27.

We have then a favorable vote obtained or influenced by misinformation as to the terms and effects of the order.

We have also the Dairymen's League alone casting in favor of the order two-thirds of all the votes cast in favor of the order.

Should the conscience of the Court be satisfied that the order should be enforced when it was adopted on such a referendum and under the circumstances here shown? Manifestly not unless the Secretary's finding is binding on the Court despite the fact that some of the misinformation was contained in departmental literature sent to producer voters.

It is said that the Secretary cannot be held responsible for the acts of the Bargaining Agency and the Dairymen's League. There can be little doubt of the co-operation between Federal and State Agents with the co-operatives to bring about a favorable vote for the order in the referendum. Of this, the Secretary himself was probably unaware and relied on his subordinates. Indicative of co-operation is the misleading statement in the Department's published statement of August 1938, taken verbatim from the Dairymen's League News of August 16, 1938.

After the order became effective on September 1, 1938, strenuous efforts were apparently made to persuade or coerce proprietary handlers to sign the marketing agreement. Every handler signing the agreement estopped himself from any legal attack on the order after signing and for a period of 31 to 59 days after he should withdraw from the marketing agreement.

Specific instances of diversion or of withholding of milk from dealers until

they signed the marketing agreement appear in the record and some of them were the result of official pressure but not directly by the market administrator.

Effort was made to persuade at least one producer to withhold milk from the Defendant Jetter Dairy Company. Publications by the Bargaining Agency and the Dairymen's League, letters by officers thereof, frankly suggest pressure, if not more, to persuade the handlers to sign the marketing agreement.

In the Dairymen's League News of September 20, 1938, on the front page appeared an article headed "Producers Ready to Divert Milk from Non-Complying Dealers":

"League gets thanks from Bargaining Agency for its offer of marketing facilities."

"Volunteer Enforcement Agents * *
"100 Strong Working the Roads
Last Week * * * "

This action followed a meeting of delegates of the Metropolitan Co-operative Milk Producers Bargaining Agency in Syracuse September 10th. The delegates voted to have 100 farmers go out as volunteer enforcement agents to "crack down" on dealers who have not signed the marketing agreement.

" * * * The Dairymen's League Plants are open * * * and others too said Mr. ——— (a State official). Call me up. I'll tell you where to put your milk. You won't have to divert very long before these dealers will be ready to sign up."

In the Bargaining Agency's "Milk Producers Market News" for October 1938 appeared this: "Please bear in mind that our able Secretary ——— who is in charge of the 'Minute Men' is doing a fine job and these men are on the watch at all times for disturbances, chiseling and other items that are not for the best interests of your producers."

Other statements of suggested coercion and force are frequent.

On September 21, 1938, an officer of the Bargaining Agency issued a letter which was circulated among the producers, including those of the Jetter Dairy Company. Among other things the letter said: " * * * almost every dealer in the Metropolitan Market has signed the agreement. In some instances it has been necessary to exert producer pressure and the willingness of producer to co-operate in withholding or offering to withhold their milk until their dealer signed, has been encouraging and gratifying."

From September 1, 1938, to December 1, 1938, the Bargaining Agency has spent $31,348.98.

It is not an unreasonable inference under the evidence of persuasion, pressure and coercion that no small part was spent in obtaining the signatures by handlers to the marketing agreement to prevent litigation which the agency asserted had impaired the effectiveness of the order in the Boston Marketing area.

The record shows clear evidence that the Dairymen's League and the Bargaining Agency, aided by some officials not Federal, brought about the signing of the marketing agreement by nearly all the handlers.

Efforts were made to persuade the producers of the co-operatives delivering to the defendant Jetter Dairy Company and others who had not signed the marketing agreement to transfer their milk to other handlers, by representations that the producers delivering to Jetter Dairy and others might not be paid for their milk.

It is urged that these post-referendum happenings are not relevant either as to the referendum or as to the terms, conditions or validity of the order or of the statute. The question is not free from doubt. But they seem to this Court to fit into and illustrate the design to prepare, present and secure, the approval of this order, first by the public authorities and then by the producers in the referendum on this order, apparently so greatly desired by the Dairymen's League, the Bargaining Agency and the large co-operatives and large handlers, and also to aid in understanding the operation and effect of the order.

Without doubt, the Secretary of Agriculture hoped and believed order No. 27 and its complementary State order No. 126 would remedy the chaotic milk situation in the Metropolitan Area, which had been a vexatious and seemingly unending problem to legislative bodies and executive authority. Undoubtedly the State Commissioner of Agriculture had like hope and belief.

It may be assumed that the Bargaining Agency and Dairymen's League Co-operatives believe that these orders would solve the milk problem when they prepared and put forward their proposed order or or-

ders. The results, however, have not justified such expectations.

The results of the operation of the order would not ordinarily be a matter of judicial concern, but if such results have the effect of taking the property of one set of handlers without compensation and giving such property to another set of handlers, amounting to what the defendants call confiscation, it bears upon the validity and constitutionality of the order and the statute.

It is agreed here that handlers must receive not less than $9\frac{3}{4}$ cents per quart for milk in glass bottles sold to stores and other retail dealers in order to pay for full butter fat content and all other charges and make full payment under the order to producers.

This price is based upon efficient operation and makes no allowance for inefficiency.

About September 1st, the price to retail distributors was advanced to $9\frac{3}{4}$ cents per quart. Within two weeks cut-throat competition under the order reduced this price to a level of from 8 to 9 cents per quart and milk was being sold generally at that price to dealers and store trade in the Metropolitan Area. This is about the same price that prevailed before the order became effective.

Some time prior to September 1st, 1938, the Jetter Dairy Company had been selling to one Weintraub thirty cases of milk daily and the price of the milk on that date was $9\frac{3}{4}$ cents per quart. On September 4th, 1938, the Dairymen's League solicited said account and by selling milk at nine cents per quart acquired 10 cases of said trade. Gold Medal Farms, Inc., by the same price cutting on the same date also acquired 10 cases of the trade of the said Weintraub. In order to retain the balance of 10 cases of such trade the defendant Jetter Dairy Company was compelled to reduce its price to nine cents per quart on September 5th, 1938.

The Sheffield Farms Company offered one Herman Lavender milk at $9\frac{3}{4}$ cents per quart on all milk purchased and in addition thereto delivered 13 quarts per case instead of 12 quarts, the extra quart of milk further reducing the price $\frac{3}{4}$ cents per quart, making a net cost to Lavender of $9\frac{1}{4}$ cents per quart.

The Sheffield Company, a subsidiary of National Dairy Products Corporation, also sold milk to one Rose Paley. This Company gave her 35 cases of free milk to induce her to buy Breakstone milk, the latter being also a subsidiary of National Dairy, and its milk being sold by the Sheffield Company.

The Dairymen's League also gave the same Rose Paley 35 cases of free milk to procure her using the Dairymen's League milk.

The Sheffield Company delivered milk to Mrs. Paley at $9\frac{3}{4}$ cents per quart and collected that amount and rebated to her in cash at the rate of $\frac{3}{4}$ cents per quart. The Dairymen's League billed milk to her at 9 cents per quart.

The Grand View Dairy Company, which had been selling Mrs. Paley milk, refused to give her any free milk and she discontinued buying from it and obtained all her milk from Sheffield's and the Dairymen's League, who made the aforesaid concessions.

The practices above referred to were general throughout the marketing area and therefore the price of milk to grocers and other retail distributors was lowered to a price varying from 8 to 9 cents per quart. Producers who sell directly to the grocers and retail distributors are not subject to the order, selling their own milk and do not have to pay the producers a uniform price nor do they have to pay into any producers settlement fund.

One of these, the Balsam Dairy Company, a producer dealer, owning a large number of cows and free from the order, selling milk in Brooklyn, sold milk to Israel Hoch in September and October in Brooklyn at $8\frac{1}{2}$ cents per quart and presumably since.

From September 1, 1938, to January 1, 1939, the defendant Jetter Dairy Company lost 240 cases of daily sales of milk to competitors by reason of these concessions.

The Jetter Dairy Company handles a minimum of 40,000 quarts per day. The resulting loss of 1 cent to $1\frac{1}{2}$ cents per quart has been from $400 to $600 per day.

The average quantities of fluid milk sold by the Dairymen's League, including milk distributed directly by the Dairymen's League and milk sold by the Dairymen's League to Distributors during the months of September, October and November 1938 was approximately 26,000 forty-quart cans or a total of 1,640,000 quarts daily,

constituting about 34% of the fluid milk in the marketing area.

If the Dairymen's League had to pay the same uniform price to producers as does the Jetter Dairy Company and other independent proprietary handlers on the same basis of sale at 1 to 1½ cents below the cost price of 9¾ cents per quart, the Dairymen's League would lose from $10,-400 to $15,600 per day. But the Dairymen's League does not pay the uniform price to these producers and is not required by the statute or the order to do so. It may deduct such losses from its price paid to producers. Besides that, it may recoup itself in other ways by service charges and milk sales out of the area.

The amounts paid to producers by the Dairymen's League for Class 1 Milk, at the base for 3.5% butter fat content in the 200 mile zone in cash and certificates of indebtedness to be taken as cash are as follows:

> September 1.75%
> October 1.81%
> November 2.01%

While the uniform price fixed by the administrator on the same basis of 3.5% milk for the 200 mile zone was as follows:

> Sept. 1.87%
> October 1.91%
> November 2.10%

It will be seen that the uniform price which the proprietary handlers paid to the producer was greater than that paid by the Dairymen's League to the producers as follows:

> September 12 cents, October 10 cents, November 9 cents per cwt.

Another source of great discrimination in favor of the large milk operators who can sell in the outside market is contained in the provision that the handler may blend the price of milk sold in the outside market with the milk in the Metropolitan area.

The Dairymen's League sold large quantities of milk, called unpriced milk in New Jersey, averaging more than 10,000,-000 pounds per month.

The producers' price of milk in New Jersey is fixed by the State Board at $2.76 per cwt. It is not established in the evidence that the Dairymen's League received that price for its milk produced in the New York Production area and sold in New Jersey.

While the Dairymen's League offered the defendants almost all the things they desired about their prices and quantities, etc., the prices at which the Dairymen's League sold in New Jersey was not disclosed and the Court did not require its disclosure.

The New Jersey State Board fixes the resale price of milk sold to stores at 12 cents per quart in rural districts, and 13 cents per quart in the three heavily populated districts.

This compares with prices of 8 to 9 cents per quart received for such milk wholesale in the Metropolitan area.

The records of the Dairymen's League show that they sold about 20% of their entire sales in New Jersey.

It is a reasonable inference that its milk was sold at about the fixed price in New Jersey or at very little less than that price, if such price was not obtainable.

If they sold at the base price of $2.76 per cwt. in New Jersey, the difference between the amount which the Dairymen's League received from this New Jersey Milk and the price it paid to the producers for September is $1.01 per cwt. ($2.76 — $1.75). For October the difference was 95 cents per cwt. ($2.76 — $1.81). For November the price was 75 cents per cwt. ($2.76 — $2.01).

The price which the Dairymen's League paid to its producers for this large quantity of milk (10,208,500 lbs.), amounted for the September milk to $178,-648. This is on the basis of about $1.75 per cwt. Assuming a sale price of $2.76 per cwt., this leaves about $103,195 profit on this milk sold in New Jersey in September from which must be deducted transportation charges and certain other expenses but which could not be measurably greater than on milk sold in the marketing area.

This sale was in the fixed price market in New Jersey, whereas the sales in the Metropolitan area were in the competitive market with no prices fixed and where the milk sold at from 1 to 1½ cents per quart less than it cost for production and delivery.

Strenuous objection was made by the defendants against disclosing prices which the group of handlers, of which Aarun J. Rubenfeld is the head, received in the New Jersey market, where most of his direct sales of fluid milk was made and where 99½ per cent of all the milk from the Slate Hill plant was sold as fluid milk.

It hardly admits of doubt that higher prices were received in the New Jersey market where fixed selling and resale prices have long been maintained than in the Metropolitan market area where unbridled competition exists.

It is quite true, as urged, that the defendants might have applied to the Secretary of Agriculture for a modification of Order No. 27 in some or all of the respects in which they are aggrieved thereby.

But it is not to be supposed that there could be quick action upon such an application for modification of the order and in the meantime great detriment might result to the handlers.

The handler must comply with the order during such time as it takes for the Secretary to entertain, hear and decide the application for modification of the order and for such further time as it takes for a Court to decide whether modification should have been granted.

The statute so provides.

See also U. S. v. Melvin Child Andrews, D.C.Mass. January 18, 1939, 26 F.Supp. 123.

Where any substantial amount of money is involved administrative relief is of little value.

But the order could not be amended in the two most important particulars, viz., co-operatives are exempt from payment of the uniform price to producers and the order is required to permit co-operatives to blend prices received in outside markets with prices received in the marketing area. Adjustment through a scheme such as the Producers Settlement Fund is also provided by the statute. So, administrative relief would be futile.

██ Furthermore it is the Government and not the handler which brings this suit. Also, the power does not lie with Congress to require one whose property is being taken in violation of the 5th Amendment, U.S.C.A.Const., to pursue some prescribed administrative remedy during which time his property continues to be taken without remedy, before he can apply to the Courts for protection and relief.

In a proper case, immediate resort to the Courts cannot be denied for any reason whatever.

The things of which defendant Jetter most complains are the provisions of the statute that co-operative associations need not pay the uniform price to producers which is contained in Section 8c (5)(F), the only limitation being that such a co-operative shall not sell its milk products to any handler for less than the fixed uniform price.

This section also provides for the blending of the net profits of all these sales in all markets and in all use classifications. These are two of the things which are most discriminatory.

Article 7, Section 1, of the order provides that all handlers other than co-operative associations shall pay producers not less than the uniform price. It is by the construction and operation of this act that the co-operatives do not pay the uniform price, and may blend the price of milk sold outside of the State and in other classifications with fluid milk sold in the marketing area and thereby reduce the price paid by them to producers which is never, even for fluid milk, the price required to be paid by proprietary handlers.

The co-operatives also receive payments out of the Producers Settlement Fund that are denied to the proprietary handlers, sometimes amounting to as much as five cents per cwt.

The co-operative handlers may charge to the producers and deduct from the price paid for the milk, expenses of plant operation which run from 15 to 30 cents per cwt. of fluid milk. Proprietary handlers cannot make such deductions of amounts paid for expenses of operation themselves.

While all handlers are allowed 23 cents per cwt. plus transportation costs for milk received at each station equipped only for receiving and shipping milk and transporting the same to another plant where it is utilized for other than fluid milk purposes, only the large co-operatives and large proprietary dealers are equipped to receive this 23 cents charge.

Co-operatives which are also milk dealers or handlers may and do pay their producers less than the uniform price and from their payments into the Producers Settlement Fund, if any, they receive payments back for services, which proprietary handlers cannot, and do not, receive.

In fact, there is very little that a proprietary handler, who does not sell any milk outside the marketing area, and who has no plant to which he can transfer surplus milk, can do to recoup his losses. He cannot reduce his price by "blending" a fictitious value on "unpriced" milk with that sold in the area. He has no unpriced

milk. He has no manufacturing plant, and may possess neither capital or inclination to enter the manufacturing field already principally covered by Dairymen's League, Bordens, National Dairy and some of the larger independents.

The discrimination between the small proprietary handlers and the Dairymen's League will be manifest from the following illustration of the comparative operation of the statute as applied in order No. 27 as it affects the defendant Jetter Dairy Company and the Dairymen's League. The figures include all the differentials in favor of the co-operatives.

The loss per quart is from 1 to 1½ cents per day for milk sold in the market area.

Jetter sells 40,000 quarts per day all in the marketing area, at a loss of $400 to $600 per day because required to pay the uniform price to producers.

The Dairymen's League sells about 1,640,000 quarts per day, or 41 times as much as Jetter. Dairymen's League sells without loss, for what it does not gain from sales in New Jersey and other out-of-state markets, together with the service and other differentials, it may deduct from its producers because it is not required to pay the uniform price.

Jetter owes to Producers Settlement Fund for September and October $30,000. (September payment has been made.)

Dairymen's League paid to Producers Settlement Fund for September and October $110,000, or only about 3½ times as much as Jetter.

Dairymen's League received from the Producers Settlement Fund under Article VII, Paragraph 5, in September $59,455.59, and in October $60,794.07, or a total of $120,239.66, which is about $10,000 more than it paid in. In addition, it received from this fund under Article VII, Section 6, in September $91,630, and in October $73,994, making a total of $165,524. Adding this to the aforesaid $120,239 it makes a grand total of $285,763. This is about $175,000 more than the Dairymen's League paid into the Producers Settlement Fund.

Jetter received nothing. Jetter loses at a $400 to $600 per day loss, on a 30-day month, $12,000 to $18,000. In a year that amounts to $144,000 to $216,000. One year's payments into the fund at $15,000 per month would be $180,000. In less than a year it is practically certain that all the

assets of the Jetter Company would be taken by the operation of the order and it would have no funds or assets to pay producers or to make further payments into the fund. In short, its entire property would be confiscated. This is by force of the statute as applied in the order.

As a matter of fact the defendant Jetter Dairy Company could not last a year. It had on April 1, 1938, only $50,000 capital and $30,000 surplus or a total of $80,000. The taking of its capital at the rate of only $15,000 per month would exhaust its entire assets within 6 months.

Moreover, there is nothing to prevent the Dairymen's League and other large producers from further depressing the price of milk sold in the marketing area in order to capture the customers of competitors and thus forcing the Jetter Dairy Company, and others in like situation, out of business at an even more rapid rate.

The Dairymen's League Co-operative, however, could go on indefinitely for the statute and order are greatly discriminatory in favor of co-operatives, especially large ones, which can take advantage of all the opportunities it presents.

The property of the Jetter Company, and, of course all other proprietary handlers and smaller co-operatives, is thus taken by operation of statute and order and transferred to others.

This brings us to the consideration of the questions of law here involved, apart from the misrepresentations to producers in connection with the referendum.

The two most important questions of law are these:

1. Does this statute, as applied in the order, in its operation under the conditions here existing, violate the 5th Amendment to the Federal Constitution, U.S.C.A., prohibiting the taking of property without due process of law or the taking of private property for public use without just compensation?

2. Can the discriminations in favor of co-operatives be upheld under the circumstances here existing on the ground that producer co-operatives may legally receive the special preferential treatment provided in order 27.

It is held by high authority that even though a statute may be constitutional on its face and may be valid when enacted or when given a particular application, it

may be invalid under changed conditions or when given an application which results in arbitrary and prejudicial discrimination or when its operation results in the taking of property of one without compensation and transferring it to another. Concordia Insurance Company v. Illinois, 292 U.S. 535, 545, 54 S.Ct. 830, 78 L.Ed. 1411; Borden's Farm Products Company v. Baldwin, 293 U.S. 194, 210, 55 S.Ct. 187, 79 L.Ed. 281. See also Air-Way, etc., Corp. v. Day, 266 U.S. 71, 85, 45 S.Ct. 12, 69 L.Ed. 169; Nebbia v. New York, 291 U.S. 502, 537, 54 S.Ct. 505, 78 L.Ed. 940, 89 A.L.R. 1469; Great Northern Ry. Co. v. Washington, 300 U.S. 154, 57 S.Ct. 397, 81 L.Ed. 573.

■ The acts of Congress under the commerce clause (art. 1, § 8, cl. 3) are subject to the 5th Amendment. Currin v. Wallace, 59 S.Ct. 379, 83 L.Ed. ——; Railroad Retirement Board v. Alton R. Co., 295 U.S. 330, 347, 55 S.Ct. 758, 79 L.Ed. 1468; Monongahela Navigation Company v. U. S., 148 U.S. 312, 336, 13 S.Ct. 622, 37 L. Ed. 463; U. S. v. Chicago, Milwaukee & St. Paul R. Co., 282 U.S. 311, 327, 51 S. Ct. 159, 75 L.Ed. 359.

■ Congress has not the power under the commerce clause, or otherwise, to take without compensation property of one and transfer it to another. And this is so, even though it be for a valid public purpose as is claimed here and as the statute intends. Railroad Retirement Board v. Alton R. Co., 295 U.S. 330, 359, 55 S.Ct. 758, 79 L.Ed. 1468; Monongahela Nav. Co. v. U. S., 148 U.S. 312, 336, 13 S.Ct. 622, 37 L.Ed. 463; Louisville Joint Stock Land Bank v. Radford, 295 U.S. 555, 580, 602, 55 S.Ct. 854, 79 L.Ed. 1593, 97 A.L.R. 1106.

There can be little doubt that the statute, as applied in the order by means of the Producers Settlement Fund, takes the money from one group without compensation and transfers it to another, however disguised that transferring and taking may be, by representing it to be necessary to stabilize milk production and to take care of surplus milk.

The Milk Producers Settlement Fund here bears a close resemblance to the pooling fund, to which, under the Railroad Retirement Act, the large carriers were required to contribute for the benefit of employees of the weaker roads.

That act was enacted under the commerce clause and was held to violate the 5th Amendment because it took "the property or money of one and [transferred] transferring it to another without compensation, whether the object of the transfer be to build up the equipment of the transferee or to pension its employees." [295 U.S. 330, 55 S.Ct. 765.]

The money taken from one (Jetter) was in effect transferred to another (Dairymen's League and some other large co-operatives) for the benefit of the producers of such co-operatives and in effect for the benefit of these co-operatives themselves.

■ The 5th Amendment is intended to protect the property and affairs of all citizens alike regardless of all other considerations, and forbids the taking of the property of one without compensation and transferring it to another.

All the public purposes declared to be the object of the Railroad Retirement Act, 45 U.S.C.A. §§ 201–214, were set aside as no consequence in face of the 5th Amendment. So here, the welfare of the producers and co-operatives, sought to be served by the agricultural marketing agreement act must be set aside, because here, as in the Alton case, the property of one by the force of the statute and order, is taken and transferred to another in violation of the 5th amendment.

This case has analogy to Thompson v. Consolidated Gas Utilities Corp., 300 U.S. 55, 57 S.Ct. 364, 81 L.Ed. 510, even though the statute there involved was a state statute.

The validity of the extractions from one for the benefit of the other cannot be supported by the so-called "pooling" cases upholding workmen's compensation acts (Mountain Timber Company v. Washington, 243 U.S. 219, 37 S.Ct. 260, 61 L.Ed. 685, Ann.Cas.1917D, 642, New York Central Railroad v. White, 243 U.S. 188, 37 S.Ct. 247, 61 L.Ed. 667, L.R.A.1917D, 1, Ann.Cas.1917D, 629); nor by the statutes requiring banks to contribute to a common fund for insuring deposits (Noble State Bank v. Haskell, 219 U.S. 104, 31 S. Ct. 186, 55 L.Ed. 112, 32 L.R.A.,N.S., 1062, Ann.Cas.1912A, 487; Abie State Bank v. Bryan, 282 U.S. 765, 51 S.Ct. 252, 75 L. Ed. 690).

These cases were cited in the Alton case and distinguished by Court and held without analogy.

In all those statutes there was a possible future benefit to be received by the one whose contribution was required. There is no possible benefit to be received here by the contributors.

The New England Divisions Case, 261 U.S. 184, 43 S.Ct. 270, 67 L.Ed. 605, and Dayton-Goose Creek Railway Co. v. U. S., 263 U.S. 456, 486, 44 S.Ct. 169, 68 L. Ed. 388, 33 A.L.R. 472, are equally without application here. There a fair return on the investment was provided by the rate fixed or otherwise. Here no fair return is provided. The requirements of the Statute and order not only do not provide for a fair return or any return on the investment but in fact take the entire investment in periodic exactions.

These cases were also distinguished in the Alton case:

Hegeman Farms Corporation v. Baldwin, 293 U.S. 163, 55 S.Ct. 7, 79 L.Ed. 259, upon which some of the plaintiffs rely, has little application here.

There was no producers settlement fund nor other pooling arrangement for payments by one of the beneficiaries to another. The decision was influenced there by the failure of any showing by the plaintiff that his handicap in competition was not due to his own inefficiency.

There is no question of inefficiency, as has been shown.

It is said that the losses suffered by Jetter Dairy Company and others are caused by the competitive conditions in the marketing area and not by reason of the statute and order. It is the order under the statute which compels the proprietary handlers to make fixed payments to producers and other payments into the milk producers settlement fund and causes these large losses, while permitting co-operatives to pay what they please to producers and giving such co-operatives, especially large ones, other discriminatory preferences, both as to the amount paid into and withdrawn from the producers settlement fund. These grossly discriminatory provisions permit in such a competitive market by means of the settlement fund, the taking of the property of some and transferring to others without compensation and thereby eliminating them entirely from the competitive field.

This competitive condition was known when the statute was enacted and the order was issued, for it had long existed and could not be cured by any and all the previous attempts at remedy. These defendants have no power or control over these competitive conditions. Efficiency is not a factor.

This is not a case of "protecting a business against the hazards of competition" as plaintiff's counsel assert, citing Hegeman Farms Corp. v. Baldwin, 293 U. S. 163, 55 S.Ct. 7, 79 L.Ed. 259, supra.

This is more like a case of statutory disarming of one set of competitors and sending them into competitive battle against another set, to whom the same statute supplies arms.

Neither the order nor the statute made any attempt to remedy the competitive conditions and the operation of the order must have been foreseen. In any event the statute as applied in the order brings the arbitrary discrimination and disaster hereinbefore shown.

Nebbia v. New York, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940, 89 A.L.R. 1469, has little analogy. There the New York Statute fixed minimum prices for the sale of milk at retail and provided a penalty for violations. The case came before the Court upon a conviction for selling under price.

The Court does in its opinion summarize the conclusions of the Legislative Committee respecting the milk industry of New York. These conclusions refer to the desirability of compelling an equal sharing of the burden of the surplus milk by all producers and distributors. These statements, however, are those of the committee and not of the Court.

Public Service Commission v. Great Northern Utilities Co., 289 U.S. 130, 53 S. Ct. 546, 77 L.Ed. 1080, is inapplicable. In that case there was in the first instance no allegation and no proof that the rates prescribed were confiscatory. Amendment to allege confiscation but without proof was held unavailing.

There are no decisions of any appellate Court upholding such an order as this under provisions of this statute.

U. S. v. David Buttrick Company, 1 Cir., 91 F.2d 66, merely decided that the provisions of the Agricultural Adjustment Act relating to milk were not covered by the decision in U. S. v. Butler, 297 U.S. 1,

552

56 S.Ct. 312, 80 L.Ed. 477, 102 A.L.R. 914, which declared other provisions of that act void. The district court had held the whole act void under the Butler case and the Circuit Court of Appeals reversed and sent the case back for trial. The case related to the statute before its amendment in 1937.

In Hood & Sons et al. v. United States, 1 Cir., 97 F.2d 677, the District Court granted a temporary mandatory injunction of the same kind sought here. On Appeal the Circuit Court of Appeals modified the injunction and directed the payment into the registry of the Court of the moneys required under the temporary injunction to be paid to the market administrator. The Circuit Court of Appeals held that the defenses were not frivolous and should be heard by the District Court before final decision.

In Whittenburg et al. v. U. S., 5 Cir., 100 F.2d 520, the Secretary of Agriculture brought suit against a handler of citrous fruits in Texas from violating the order there involved. There more than 50% of the handlers had signed the marketing agreement and the order was approved by two-thirds of the producers. The Secretary made weekly regulations forbidding shippers to ship in interstate commerce and to Canada grape fruit below stated standards of *size* and *quality*. The Court held the provisions of the act constitutional. The Court relied chiefly on U. S. v. David Buttrick Co., 1 Cir., 91 F.2d 66, supra, and Edwards v. U. S., 9 Cir., 91 F.2d 767, later referred to and on the Currin Case, Wallace v. Currin, 4 Cir., 95 F.2d 856, affirmed by the Supreme Court, 59 S. Ct. 379, 83 L.Ed. ——.

It will be noted that there was no equalization fund or producers settlement fund as here and no differentials or other discriminatory preferences.

The handler was not required to pay into any fund for transfer to others and the handler was on the same basis as all other handlers having inferior fruit.

Edwards v. U. S., 9 Cir., 91 F.2d 767, contains no equalization scheme and no fund like the Producers Settlement Fund here into which one set of handlers are to pay into a fund to be transferred to other handlers. The order complained of there merely prorated the shipment of fruit in interstate commerce. It has little analogy to the order and conditions here.

Wallace v. Hudson-Duncan & Company, 9 Cir., 98 F.2d 985, 987, is not in strict analogy. The case related to unshelled walnuts. In that case the order issued by the Secretary of Agriculture under the Agricultural Adjustment Act as amended, 7 U.S.C.A. § 601 et seq., and held valid by the Court, required that a packer (not a grower):

"Either (1) must sell or hold all the walnuts it acquires in the state of acquisition;

"Or (2) export from the state not more than a percentage of its intended shipments determined [percentage] by the Secretary for each 'crop year', * * * upon the consideration of the delivery of the remainder of such intended export to a control Board.

"The Board may sell the walnuts it received to purchasers abroad or to shellers within the United States, at prices fixed by the Board, or may eliminate all or part of them from the market by donation or sale to charitable institutions in the United States, with provisions that such sales or donations shall not enter the channels of trade in the United States as unshelled walnuts.

"The Board also has the power to release to interstate shipment through the contributing packers all or portions of the surplus delivered to it, if, in its opinion, the proper control of the interstate market warrants it. The proceeds of the disposition of the surplus and payments of credit value by the shippers are to be ratably apportioned and distributed to them by the Board;

"Or (3) may export from the state all of its intended interstate shipments upon the consideration of a payment to the Board, not of what the packer has sold them for, but of a certain 'credit value', fixed for all shippers by the Board, of the surplus walnuts which would otherwise have been delivered to the Board."

While that order has seeming similarity to the order here involved, there are distinguishing differences.

1. There is no discrimination among packers as there is among handlers here where co-operatives are given a decidedly preferential position.

2. There are no prices fixed to be paid to producers as is done here.

3. There the object is to maintain the price of walnuts in the interstate markets,

while here the sole object is to secure a price to producers before the milk passes into interstate commerce and no thought is given to prices in the interstate market which are subject to cut-throat competition largely by those given a preferential status in the order.

4. There the packers deliver walnuts to the Control Board, the proceeds of the sale of which, if sold, are distributed ratably to the same packers who delivered to the Board, while here the payments out of the producers settlement fund are not paid to handlers ratably but on a plan involving preferential treatment based on whether or not the handlers are co-operatives and whether they render services or not. Also here payments into the pool are subject to gross discrimination.

5. There the walnuts might be kept or sold in intrastate commerce free from the order. Here milk cannot be kept for it is highly perishable. Here, if sold in intrastate commerce in the marketing areas, it became subject to State Order No. 126 which provides for the same payment to the same producers settlement fund.

In the Hudson-Duncan case the Court recognized that such a regulation would be violative of the 5th amendment if unreasonable, arbitrary or capricious, citing Nebbia v. New York, 291 U.S. 502, 525, 54 S.Ct. 505, 78 L.Ed. 940, 89 A.L.R. 1469, but held that the regulation was reasonable with one judge dissenting. It will be seen that the Hudson-Duncan case has little analogy to the case at bar.

In U. S. v. Melvin Child Andrews, D.C. Mass., Jan. 18, 1939, 26 F.Supp. 123, mandatory injunction was granted to the Secretary requiring the defendants to pay into a milk price equalization fund. Whether or not there were other discriminatory provisions such as exist here is not disclosed. The discussion relates chiefly to whether all the defendants were engaged in interstate commerce. The opinion discloses that the judge writing the opinion believed there should be uniformity of decision in the District Court of that district. That decision is not controlling or persuasive here.

U. S. v. Goldsmith Fruit Company, D. C., 19 F.Supp. 147, upheld the order of the Secretary under the Act before its amendment in 1937. That order had practically none of the provisions here and the case is not analogous.

It is also in direct conflict with Fosgate Co. v. Kirkland, D.C., 19 F.Supp. 152, decided one month later in the same district, in which later opinion the Judge said he could not follow the Goldsmith case.

There apparently are no further decisions under the act which have any analogy to the order and the facts here existing.

The defendants make some further contentions which may be briefly considered. It is urged that no provision of the statute authorizes Article VII, Sections 5 and 6 of the order.

These relate to payments of 5 cents per cwt. to co-operatives and market services of 23 cents per cwt. and transportation charges both to co-operatives and proprietary handlers.

The court does not find any sections of the act which clearly and definitely authorize such payments. If there be none, the order does not comply with the statute and should not be enforced.

It is also urged that Congress in the Act has neither fixed the price to be paid to producers nor prescribed a formula for fixing such price. This is not free from doubt.

If, without prescribing the price or a formula for determining the price, the statute authorizes the Secretary with the approval of two-thirds of the producers to fix a price without laying down standards to be applied, then there seems no escape from the conclusion that the statute delegates to the Secretary and producers powers which are essentially legislative and such delegation of power is invalid whether the delegation is to the Secretary or the producers separately or to both together. Carter v. Carter Coal Company, 298 U.S. 238, 310, 56 S.Ct. 855, 80 L.Ed. 1160. The case would then come within the decision of the Carter case rather than within Currin v. Wallace, supra.

Since the decision may be reached on other grounds, this question need not be decided.

Plaintiffs cite many statutes, both State and Federal, providing for certain preferential treatment to producers and co-operative associations of producers, certain cases in which the validity of some of them have been upheld. But none of these statutes carry any such arbitrary, discriminatory provisions as the applicable

provisions of the Agricultural Marketing Agreement Act and Order 27. None take from one and transfer to another without compensation. Some are tax cases where producers selling their own products are classified differently from dealers who are not producers and exempted from a tax imposed on such dealers. Some relate to classifications of dealers or other persons not many of which relate to co-operatives.

Liberty Warehouse Company v. Burley Tobacco Growers' Co-op., 276 U.S. 71, 48 S.Ct. 291, 72 L.Ed. 473, is the case most relied upon. A Kentucky statute aiming to assist Agricultural Producers in the orderly marketing of their crops, authorized the incorporation of non-profit associations with membership confined to producers, to contract with their respective members for ten years to market the members' crops. It also provided that any warehouseman knowingly inducing such member to break his contract by receiving such member's tobacco for sale or auction should be liable for a penalty of $500 to be recovered in a civil suit by a co-operative. The Supreme Court upheld a judgment so recovered. The lack of analogy is clear.

In Frost v. Corporation Comm., 278 U.S. 515, 49 S.Ct. 235, 73 L.Ed. 483, the discrimination in favor of co-operatives there involved was held to be unconstitutional.

Board of Trade of City of Chicago v. Olsen, 262 U.S. 1, 43 S.Ct. 470, 67 L.Ed. 839, has no analogy.

In Eisenberg Farms, Inc. v. Baldwin, 265 N.Y. 662, 193 N.E. 434, it was contended that the New York milk control law was unconstitutional because it failed to require co-operative associations to return to their producers the prices fixed by the state milk control law. The Court of Appeals sustained the statute, but without opinion. The decision in the Eisenberg case was explained, however, by the Court of Appeals in Matter of Mayflower Farms, Inc., v. Baldwin, 267 N.Y. 9, 12, 195 N.E. 532, 533, as follows: "In Matter of Eisenberg Farms, Inc. v. Baldwin, 265 N.Y. 662, 193 N.E. 434, this court decided that the differential clauses in favor of co-operative associations which permitted them to pay to producers less than the price fixed by the Commission for milk was constitutional."

It may be said that the Court in 265 N.Y. 662, 193 N.E. 434, wrote no such opinion but did uphold the lower court so deciding.

The discrimination in favor of co-operatives in that statute is but a small matter compared to the comprehensive discriminatory scheme provided in the Marketing Act and Order 27, and can have little bearing here.

There is no need to prolong the discussion of statutes or decisions relating to co-operatives. There are no authoritative cases upholding any such discrimination in favor of co-operatives as here exists. None say that the 5th amendment permits one to be treated differently from another.

The defendant co-operatives are not quite in the same situation as the Jetter Dairy Company. It is quite true, as the Government contends, that they may not complain of any preferential treatment of co-operatives of which they may take advantage.

But there seems no good reason why they may not complain of discriminatory preferences of which only the large dealers, co-operative and proprietary handlers, may avail themselves, such as the 23 cents per cwt. for transfer of milk from a non-manufacturing to a manufacturing plant, the blending of prices for which unpriced milk may be sold in New Jersey and other non-marketing area markets with prices of milk sold in the marketing area. They can avail themselves of none of these preferential provisions of statute and order.

The order is also discriminatory as against them. They pay money which would otherwise be distributed to their producers, to the Settlement Fund, in order that it may be paid out to the large co-operatives and large proprietary handlers. They are forbidden by law to sell milk in the area at less than the prices fixed by the order. They are also required to pay into the Producers Settlement Fund to provide preferential payments made to producers living in 18 counties, under the provisions of Article 6, Section 8. The producers in those counties receive 20 cents per cwt. in addition to the locational differentials, which return them a higher price for their milk because they are located nearer New York. By this means, moneys of the Rock Royal and the Schuyler Junction and Central New York Co-operatives, are taken to be given to other producers for the most part,

delivering to the three large proprietary and co-operative handlers, without compensation to these small defendants.

If they pay into the Producers Settlement Fund on the order basis they like also the smaller proprietary handlers, though in lesser degree, suffer confiscation of their property by the same taking from one and transferring to another.

There can be little doubt that under the situation, existing when the order became effective, the large dealers doing 70% of the business in the marketing area enjoy discriminatory preferential treatment over most of the handlers doing the remaining 30% of the business.

There remains to be considered the separate contention of the defendant Central New York Co-operative. This defendant contends that it does not come within the terms of the order because as a co-operative marketing association it merely acts as an agent for the producers in marketing their milk; that their legal status is that of producers marketing their own milk, which, if true, removes them from the operation of the order.

Central New York Co-operative has paid uniform prices to its producers and has left after such payments and payments of all expenses a sum not exceeding half the accounts fixed by the administrator for payment into the Producers Settlement Fund for each month.

This co-operative is incorporated under the laws of the State, rents milk receiving plants, where, as it contends, it receives milk as their agent, from producers who are members and some others under contract with it and still as agent delivers the milk to other agents who are wholly owned subsidiary corporations, who sell to stores and retail distributors. The proceeds of the sale come back to the defendant co-operative, presumably less the expense of the selling agents and are paid to the producers less the expense of operating the receiving plants.

Such a claim that the Central New York Co-operative and its subsidiary corporations are merely agents for the producers is somewhat difficult to accept. This co-operative owns no farms or cows and directly produces no milk.

The Government contends that such a co-operative is a handler within the definition of handler and therefore liable for payment into the Producers Settlement Fund. It is not free from doubt that such a definition is entirely supported by the statute. Moreover, under a similar contract it has been held that such a relation is one of joint venture and not a sale. Rhodes v. Little Falls Dairy Co., 230 App. Div. 571, 245 N.Y.S. 432, affirmed in 256 N.Y. 559, 177 N.E. 140.

It is, however, not necessary to decide this question, for even as a co-operative handler, Central New York Co-operative, suffers the same discriminatory treatment as the other defendant co-operatives who by reason of the fact that they cannot avail themselves of all the opportunities for withdrawal from the Producers Settlement Fund that are enjoyed by the Dairymen's League and other large handlers selling in the New Jersey Market and receiving the other preferential differentials, find their property taken under the order without compensation and transferred to another.

The final conclusion is that the statute as applied in the order is unconstitutional as to all the defendants in its application to the situation and conditions here existing and that the order was not approved in accordance with the provisions of the statute and should not be enforced.

Judgment may be entered dismissing the complaints as to all defendants, with one bill of costs against the Dairymen's League and Metropolitan Bargaining Agency.